BAUMAN *v.* ROSS.

ROSS *v.* BAUMAN.

ABBOT *v.* ROSS.

ROSS *v.* ARMES.

APPEALS FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

Nos. 631, 632, 633, 634. Argued December 16, 17, 1896. — Decided May 10, 1897.

Under the Fifth Amendment to the Constitution of the United States, which declares "nor shall private property be taken for public use without just compensation," Congress may direct that, when part of a parcel of land is appropriated to the public use for a highway in the District of Columbia, the tribunal vested by law with the duty of assessing the compensation or damages due to the owner, whether for the value of the part taken, or for any injury to the rest, shall take into consideration, by way of lessening the whole or either part of the sum due him, any special and direct benefits, capable of present estimate and reasonable computation, caused by the establishment of the highway to the part not taken.

By the Constitution of the United States, the estimate of the just compensation for property taken for the public use, under the right of eminent

domain, is not required to be made by a jury; but may be entrusted to commissioners appointed by a court or by the executive, or to an inquest consisting of more or fewer men than an ordinary jury.

Congress, in the exercise of the right of taxation in the District of Columbia, may direct that half of the amount of the compensation or damages awarded to the owners of lands appropriated to the public use for a highway shall be assessed and charged upon the District of Columbia, and the other half upon the lands benefited thereby within the District, in proportion to the benefit; and may commit the ascertainment of the lands to be assessed, and the apportionment of the benefits among them, to the same tribunal which assesses the compensation or damages.

If the legislature, in taxing lands benefited by a highway, or other public improvement, makes provision for notice, by publication or otherwise, to each owner of land, and for hearing him, at some stage of the proceedings, upon the question what proportion of the tax shall be assessed upon his land, his property is not taken without due process of law.

The recording by public authority of a map of a proposed system of highways within certain territory, without restricting the use or improvement of lands before the commencement of proceedings for their condemnation for such highways, or limiting the damages to be awarded in such proceedings, does not of itself entitle the owners of lands to compensation or damages.

An act of Congress, providing for the estimate of damages for taking lands for highways in the District of Columbia, and for the assessment of such damages, with interest, upon lands benefited by the highways, is not invalidated by a provision that the proceedings shall be void if Congress, after being six months in session, shall make no appropriation for the payment of the damages.

The act of March 2, 1893, c. 197, entitled "An act to provide for a permanent system of highways in that part of the District of Columbia lying outside of cities," is constitutional and valid.

THESE were appeals in proceedings commenced by petition of the Commissioners of the District of Columbia for the condemnation of a permanent right of way for the public over certain subdivisions of lands in the District of Columbia, outside the limits of the cities of Washington and Georgetown, under the act of March 2, 1893, c. 197. 27 Stat. 532. The cases involved the constitutionality of that act. They were argued together, and are stated in the opinion.

*Mr. A. S. Worthington* for the Commissioners of the District of Columbia. *Mr. S. T. Thomas, Mr. A. B. Duvall* and *Mr. Samuel Maddox* were on his brief.

*Mr. Nathaniel Wilson* and *Mr. Chapin Brown* for Bauman and others, and Abbot. *Mr. A. H. O'Connor* was on their brief.

*Mr. W. L. Cole* for Armes. *Mr. C. H. Armes* was on his brief.

MR. JUSTICE GRAY delivered the opinion of the court.

The original plan of the city of Washington, established in 1791, under the direction of President Washington, and by authority of Congress, with its symmetrical arrangements of squares and lots, streets, avenues, circles and public reservations, did not extend north of Boundary street, or affect the roads and highways in the rest of the District of Columbia.

By an act of 1809, the proprietor of any lot or square in the city of Washington was authorized to have it subdivided upon submitting a plat thereof to the surveyor of the District of Columbia, to be certified and recorded in his office upon his being satisfied that its dimensions corresponded with the original lots. Act of January 12, 1809, c. 8; 2 Stat. 511; Rev. Stat. D. C. §§ 477–481.

At a comparatively recent period, owners of lands outside the northern boundary of the city of Washington, from time to time, laid out streets over their lands, and made and recorded subdivisions thereof, as they pleased, often not conforming to each other, or to the general plan of the city of Washington; and Congress, at last, found it necessary to take measures to have the streets throughout the District of Columbia laid out upon a uniform plan.

Congress accordingly, by the act of August 27, 1888, c. 916, entitled "An act to regulate the subdivision of land within the District of Columbia," authorized the Commissioners of the District of Columbia to make and publish general orders regulating the platting and subdividing of all lands and grounds in the District, and required any plat of subdivision made in pursuance of such orders to be approved by them before being admitted to record in the office of the surveyor; and, in section 5, provided that "no future subdivision of land

in the District of Columbia, without the limits of the cities of Washington and Georgetown, shall be recorded in the surveyor's office of the said District, unless made in conformity with the general plan of the city of Washington." 25 Stat. 451; Comp. Stat. D. C. c. 58, §§ 39–43.

It was in order the more completely to carry out the same object, that Congress passed the act of March 2, 1893, c. 197, entitled "An act to provide a permanent system of highways in that part of the District of Columbia lying outside of cities," the constitutionality of which is now impugned. 27 Stat. 532.

The parts of the act chiefly attacked are sections 11 and 15. But the record discloses such differences of opinion in the courts below, and the solution of the questions involved depends so much upon a view of the act as a whole, that it will be convenient to state its various provisions somewhat fully.

The first five sections of the act relate to the making, the recording and the effect of plans for the extension of a permanent system of highways, in conformity, as nearly as practicable, with the general plan of the city of Washington, over all that part of the District of Columbia which lies outside the cities of Washington and Georgetown.

The act begins by enacting that "the Commissioners of the District of Columbia are hereby authorized and directed to prepare a plan for the extension of a permanent system of highways over all that portion of said district not included within the limits of the cities of Washington and Georgetown. Said system shall be made as nearly in conformity with the street plan of the city of Washington as the Commissioners may deem advisable and practicable."

By section 2, "the said plans shall be prepared from time to time in sections, each of which shall cover such an area as the Commissioners may deem advisable to include therein; and it shall be the duty of the Commissioners, in preparing such plans by sections, as far as may be practicable, to select first such areas as are covered by existing suburban subdivisions not in conformity with the general plan of the city of Washington. The Commissioners, in making such plans, shall

adopt and conform to any then existing subdivisions which shall have been made in compliance with the provisions of the act" of August 27, 1888, c. 916, "or which shall, in the opinion of the Commissioners, conform to the general plan of the city of Washington." "Whenever the plan of any such section shall have been adopted by the Commissioners, they shall cause a map of the same to be made, showing the boundaries and dimensions of and number of square feet in the streets, avenues and roads established by them therein; the boundaries and dimensions of and number of square feet in each, if any, of the then existing highways in the area covered by such map; and the boundaries and dimensions of and number of square feet in each lot of any then existing subdivisions owned by private persons; and containing such explanations as shall be necessary to a complete understanding of such map. In making such maps, the Commissioners are further authorized to lay out, at the intersections of the principal avenues and streets thereof, circles or other reservations corresponding in number and dimensions with those now existing at such intersections in the city of Washington." A copy of such map, duly certified by the Commissioners, is to be delivered to a commission created by this act, composed of the Secretary of War, the Secretary of the Interior and the Chief of Engineers, for the time being, who may adopt or alter it, or make a new map instead; and the map which that commission shall adopt and approve in writing is to be delivered to the Commissioners of the District of Columbia, and be at once filed and recorded in the office of the surveyor of the District of Columbia.

The same section proceeds: "And after any such map shall have been so recorded, no further subdivision of any land included therein shall be admitted to record in the office of the surveyor of said district, or in the office of the recorder of deeds thereof, unless the same be first approved by the Commissioners, and be in conformity to such map. Nor shall it be lawful, when any such map shall have been so recorded, for the Commissioners of the District of Columbia, or any other officer or person representing the United States or the District

of Columbia, to thereafter improve, repair or assume any responsibility in regard to any abandoned highway within the area covered by such map, or to accept, improve, repair or assume any responsibility in regard to any highway that any owner of land in such area shall thereafter attempt to lay out or establish, unless such landowner shall first have submitted to the Commissioners a plat of such proposed highway, and the Commissioners shall have found the same to be in conformity to such map, and shall have approved such plat, and caused it to be recorded in the office of said surveyor."

The section concludes with a provision that the Commissioners of the District of Columbia, " in order to enable the said Commissioners to proceed speedily and efficiently to carry out the purposes of this act," may, with the approval of the commission before named, appoint two civilian assistants to the engineer commissioner, who, with him, under the direction of the Commissioners, shall have immediate charge of the work to be done under this act.

Section 3 provides that " when any such map shall have been recorded as aforesaid in the office of the surveyor of the District, it shall be lawful for the owner of any land included within such map to adopt the subdivision, thereby made, by a reference thereto and to this section in any deed or will which he shall thereafter make ; and when any deed or will containing any such reference shall have been made and recorded in the proper office, it shall have the same effect as though the grantor or grantors in such deed, or the maker of such will, had made such subdivision and recorded the same in compliance with law."

By section 4, " for the purpose of making surveys for such plans and maps, the Commissioners, and their agents and employés necessarily engaged in making such surveys, are authorized to enter upon any lands through or on which any projected highway or reservation may run or lie." And by section 5, " the Commissioners of the District of Columbia are authorized to name all streets, avenues, alleys and reservations laid out or adopted under the provisions of this act."

Then follow sections 6 to 14 inclusive, containing provisions

for the condemnation of a permanent right of way for the public, and for the assessment of compensation or damages to the owners of lands by a jury of seven men, as follows:

By section 6, " within thirty days after any such map shall have been recorded as aforesaid, which shall alter any highway or highways in any then existing subdivision in the area included in such map, or which shall dispense with any highway or highways, or any part thereof, in any such subdivision, the Commissioners of the District of Columbia shall make application to the Supreme Court of the District of Columbia, holding a special term as a district court of the United States, by written petition, praying the condemnation of a permanent right of way for the public over all the land lying within the limits of such subdivision, not already owned by the United States or the District of Columbia or dedicated to public use as a highway, which shall be included within the highways or reservations laid out by the Commissioners and indicated on such map. Upon the filing of such petition, the said court in special term shall proceed to condemn a permanent right of way for the public over said land, in the manner hereinafter provided."

By section 7, " as to any highway or highways, or part of any highway or highways, laid down upon any such map, which shall not lie within the limits of any existing subdivision, the Commissioners at any time thereafter, when in their judgment the public convenience shall require the opening of the same, or of any part thereof, may make application as aforesaid to the Supreme Court of the District of Columbia, holding a special term as aforesaid, for the condemnation and opening of the same; and said court in special term as aforesaid shall thereupon proceed, in the manner hereinafter provided, to condemn a permanent right of way for the public over all the land, not already owned by the United States or the District of Columbia or dedicated to public use as a highway, included within the highway or highways, or part of a highway or highways, described in such application: Provided, that in such case the court, after public notice shall have been given as hereinafter directed, shall first hear evi-

dence as to whether the public convenience does in fact require the immediate opening of the highway or highways, or part of any highway or highways, described in such application, and shall determine that question on the evidence submitted to it; and if the court shall, as to any part of the land sought to be condemned, decide such question in the negative, it shall proceed no further as to such part at that time. And if the court, after such notice and hearing, shall determine that the public convenience does not in fact require the immediate opening of any highway or highways or any part thereof described in such application, no further proceedings shall be had under such application."

Section 8 provides that "when any application shall have been filed in said court in special term under the preceding sections of this act," the court shall cause public notice of not less than thirty days to be given of such application, "which notice shall warn all persons having any interest in the proceedings to attend the court at a day to be named in said notice, and to continue in attendance until the court shall have made a final order in the premises"; and, "after such notice shall have been given, shall take no further step until the time limited thereby shall have expired, and shall afford all parties in interest a reasonable opportunity to be heard during the proceedings"; and shall, whenever it is practicable to do so, cause a similar notice to be served upon each of the owners of the land sought to be condemned, and upon the attorney of the United States for the District of Columbia.

Section 9 provides that "when the object of any such application to said court shall be, in whole or in part, to rectify or change an existing subdivision, the court, immediately after the expiration of the time limited in such notice, shall proceed without delay to make the required condemnation, so far as it shall relate to any lands within such subdivision; and as to any lands not lying within the limits of an existing subdivision which is sought to be rectified or changed, the court shall proceed in like manner only after it shall have determined, as hereinbefore provided, that the public convenience requires

the condemnation, and then only to the extent which the public convenience shall require."

Section 10 is as follows : " When any right of way is to be condemned under this act, said court in special term shall cause a jury of seven judicious, disinterested men, not related to any person interested in the proceedings, and not in the service or employment of the District of Columbia or of the United States, to be summoned by the marshal; and shall administer to the jury an oath or affirmation that they will, without favor or partiality to any one, to the best of their judgment, determine such questions as may be submitted to them by the court during the proceedings. The court, before accepting the jury, shall hear any objections that may be made to any member thereof, and shall have full power to decide on all such objections, and to excuse any juror, and to cause any vacancies in the jury to be filled. When the jury shall have been organized, the court and the jury shall hear and receive such evidence as may be offered or submitted on behalf of the District of Columbia, or on behalf of the United States, or by any person having any interest in the proceedings; and the proceedings shall be conducted, as nearly as may be, as civil cases triable by jury are now conducted in said district; but the order of proof shall be in the discretion of the court. Upon the motion of any party in interest, the court may direct the jury to view the premises under consideration, under such regulations as the court may prescribe. When the hearing is concluded, the jury, or a majority thereof, shall render a written verdict in such form as may be prescribed or submitted to the jury by the court, which verdict shall be signed by the jurors, or by a majority of them, and filed in the court. The court shall have power to set aside such verdict, when satisfied that the same is unjust or unreasonable. One jury may be sworn, and one trial had, as to all or any of the parcels of land involved in the proceeding, at the discretion of the court; and where the jury shall have rendered a verdict as to more than one parcel of land, the court may set aside the verdict as to one or more parcels, and confirm it as to the others. When the verdict of the jury, in

whole or in part, shall have been so set aside, a new jury shall be summoned, and the proceedings continued, until the court shall have confirmed a verdict as to all the land involved in the proceeding."

Section 11 provides that " where the use of a part only of any parcel or tract of land shall be condemned in such a proceeding, the jury, in assessing the damages therefor, shall take into consideration the benefit [that] the purpose for which it is taken may be to the owner or owners of such tract or parcel by enhancing the value of the remainder of the same, and shall give their verdict accordingly ; and the court may require, in such case, that the damages and the benefits shall be found and stated separately."

Section 12 provides that no trial under this act shall fail by reason of the death or disability of any juror during the proceedings, provided the verdict is " concurred in by a majority of a complete jury."

Section 13 is as follows: " No evidence shall be offered or received by the jury as to the persons who will be entitled to receive the compensation that may be awarded as to any parcel of land. If any question shall arise as to whether any person claiming a right to be heard is in fact interested in the proceedings, the court shall hear and determine the question in a summary way, and in cases of doubt shall permit the party to be heard. The verdict of the jury shall state, as to each parcel of land involved in the proceeding, only the amount of compensation, less the benefits, if any, which it shall award in respect thereof, and shall not contain any finding as to the ownership of the land, or the persons entitled to the compensation."

Section 14 fixes the compensation of each juror at five dollars a day.

Section 15 provides for assessing and charging the amount awarded as damages, one half upon the lands benefited, and other half upon the District of Columbia, as follows: " That the amount awarded by said court as damages for each highway or reservation, or part thereof, condemned and established under this act, shall be one half assessed against the

land benefited thereby, and the other half shall be charged up to the revenues of the District of Columbia; that one half of the amount awarded by said court as damages for each highway or reservation, or part thereof, condemned and established under this act, shall be charged upon the lands benefited by the laying out and opening of such highway or reservation, or part thereof, and the remainder of said amount shall be charged to the revenues of the District of Columbia. The same jury which shall assess the damages caused by the opening of any highways or reservation, or part thereof, or by the abandonment of an existing highway or part thereof, shall ascertain and determine what property is thereby benefited, and shall assess against each parcel which it shall find to be so benefited its proper proportional part of the whole of said one half of the damages: Provided, that in making such assessment for benefits the jury shall, as to any tract a part of which shall have been taken for such highway or reservation, or part thereof, make due allowance for the amount, if any, which shall have been deducted from the value of the part taken, on account of the benefit to the remainder of the tract. The proceedings of the court and the jury, in making assessments for benefits under this section, shall conform as nearly as is practicable to the foregoing provisions of this act relating to the assessment of damages; and the verdict of the jury, making an assessment under this section as to any parcel of land, shall not be conclusive until the same shall have been confirmed by the court. When confirmed by the court, the assessment so made shall be a lien upon the land assessed, and shall be collected as special improvement taxes in the District of Columbia have been collected since February twenty-first, eighteen hundred and seventy-one" (that is to say, as all other taxes are collected; act of February 21, 1871, c. 62, § 37; 16 Stat. 427; Rev. Stat. D. C. § 151); " and shall be payable in five equal annual instalments, with interest at the rate of four per centum per annum from the date of the confirmation of the assessment by the court. That no expense for the improvement of any street, circle, reservation or avenue laid out under the provisions of this act, outside the

cities of Washington and Georgetown, shall be chargeable to the Treasury of the United States, but such expense shall be paid solely out of the revenues of the District of Columbia."

Section 16 prescribes the mode of ordering the payment and distribution of the compensation or damages to and among the persons entitled to receive the same, as follows: " When said court shall have assessed the damages to be paid as to any parcel of land the use of which shall have been condemned, or which shall have been injured by the abandonment of a previously existing highway, and there shall be no controversy as to the persons who are entitled to receive the same, or as to the distribution of the same among them, said court shall decree such payment to be made; and upon presentation of a duly certified copy of such decree to the Treasurer of the United States he shall report the same to Congress for consideration and action, and shall make such payment to the person or persons appearing by such decree to be entitled thereto, as Congress may provide. But where any such controversy shall exist, or where there shall be any doubt as to the proper disposition of the compensation awarded, the court shall order that the damages assessed by it, involved in such controversy or doubt, shall be paid into the registry of the court; and upon the presentation of a duly certified copy of such order to the Treasurer of the United States he shall, when the necessary money is appropriated, pay the amount therein mentioned to the clerk of said court; and the claims of the respective parties thereto shall thereupon be heard and decided by the court as in interpleader suits in equity, under such general rules as may be prescribed by said court in general term."

Section 17, as originally passed, provided for appeals from the Supreme Court of the District of Columbia in special term to the same court in general term; but, as amended by the act of January 21, 1896, c. 5, provides that any party aggrieved may appeal to the Court of Appeals of the District of Columbia, upon questions of law only, from "the final order or decree of said court in special term, fixing the amount of damages, or the assessment for benefits, as to

any parcel of land"; and, upon questions both of law and of fact, "from a final judgment of said court in special term under this act, distributing the damages among contending claimants"; and further provides that "from any judgment or order of said Court of Appeals, involving any question as to the constitutionality of this act, or of any part thereof," any party aggrieved may appeal to this court, and this court "shall determine only the question of constitutionality involved in the case." 29 Stat. 2.

Section 18 makes payment of the damages to the parties, or into court, an absolute condition of the taking possession of the land by the Commissioners, and of the validity of the proceedings, and is as follows: "Whenever any final decree shall have been made by said court, under the provisions of this act, for the payment of the damages to the parties, or into the registry of the court, and when the money has been appropriated and paid, the Commissioners shall be entitled to take immediate possession of the parcel of land in regard to which said order of payment shall have been made, and the court shall enforce such right of possession by proper order, and by process addressed to the marshal of the United States for the District of Columbia. In case the court shall enter judgment of condemnation in any case, and appropriation is not made by Congress for the payment of such award within the period of six months, Congress being in session for that time after such award, or for the period of six months after the meeting of the next session of Congress, the proceedings shall be void, and the land shall revert to the owners."

The nineteenth and concluding section requires the Commissioners of the District of Columbia to include in their annual report a full statement of their action, and an estimate of necessary expenditures, under this act.

Pursuant to sections 1 and 2 of the act of 1893, a plan, in sections, was prepared and adopted by the Commissioners of the District of Columbia, and a map thereof was approved by the commission named in section 2, and was filed and recorded in the surveyor's office, for the extension of a permanent system of highways in so much of the area of the District of

Columbia as is bounded on the east by North Capitol street, on the west by Rock Creek, on the north by the boundary line of the District, and on the south by Florida avenue, formerly Boundary street, and containing forty-seven existing suburban subdivisions.

On September 27, 1895, within thirty days after the recording of the map, the Commissioners presented to the Supreme Court of the District of Columbia a separate petition, under section 6, for the condemnation of a permanent right of way for the public over all the land lying within the limits of each of those subdivisions, among which were one known as Dennison and Leighton's subdivision of a part of Mount Pleasant and Mount Pleasant Plains, and through which Sixteenth street, if extended, would pass; and another known as the Ingleside subdivision, through parts of which would pass extensions of Seventeenth, Eighteenth and Nineteenth streets. Upon the petition relating to each of these two subdivisions, due publication of notice was made, as required by section 6, and some owners of lands appeared and filed answers, alleging that the act was unconstitutional.

Upon the petition relating to the Dennison and Leighton subdivision, a jury of seven was summoned and organized, pursuant to section 10 ; and, after a trial before Justice Cox, and the introduction of evidence by the petitioners and by the respondents, rendered a verdict, in the form prescribed by the court, setting forth a description of each parcel of land affected ; the number of square feet in the parcel; the number of square feet taken ; the number of square feet not taken ; the compensation for land taken ; the compensation for buildings taken ; the damages to the remainder of the parcel, including damages to the buildings ; the benefits to the remainder of the parcel; and the award, being for compensation and damages, less benefits.

On February 5, 1896, on motion of the respondents, Justice Cox ordered and adjudged that the verdict be set aside, and the petition dismissed, on the ground that the act of 1893 was unconstitutional and void, for the reasons stated in his opinion filed on the same day. In that opinion, the learned judge

admitted it to be established by the weight of authority that, under the right of eminent domain, the special benefits to an individual lot, of which a part was condemned, could properly be set off against or deducted from the amount found due as the value of the land appropriated and as special damage to the remainder of the tract or parcel; and that, under the legislative power of taxation, an assessment might be laid upon such remainder and other lands in the neighborhood, for the general benefits derived from the existence of the new street.    But he held that either a deduction for special benefits, or an assessment for general benefits, should be for benefits which, if not immediately realized, should be at least so far present as to be certain and presently ascertainable; that the act of 1893, in a proceeding (such as this was) under section 6, relating to a highway through an existing subdivision, simply required a condemnation of the right of way, and did not, as in a proceeding under section 7 relating to lands not within an existing subdivision, also require an immediate opening of the highway; that the act authorized the taking of private property for public use, and attempted to pay for it partly in future and contingent benefits, and failed to provide for the just compensation required by the Constitution to be made, and was therefore an unconstitutional appropriation of private property, which the courts could not carry out; and consequently that section 11, as applied to the case, was unconstitutional and void, and the whole proceeding must be set aside. He further suggested, although not deciding, that section 15, providing for an assessment of half the damages upon the lands deriving a general benefit from the highway, could not be carried out, because, while committing that assessment to the same jury, it fixed neither the taxing district, nor the rule of apportionment; and also observed that "the recording of the map by the Commissioners, if nothing is done in pursuance of this step, is only a less injury to the lot-owners than taking their property without paying for it." 24 Washington Law Reporter, 65–71.

From that judgment, the Commissioners appealed to the Court of Appeals of the District of Columbia, which, in an

opinion delivered by Justice Shepard, Justice Morris concurring, reached the following conclusions:

1st. That under the last clause of the Fifth Amendment to the Constitution of the United States, "nor shall private property be taken for public use without just compensation," this just compensation means "the actual value of the property taken, payable in money, and without diminution on account of benefits general or special," although special benefits might be considered in respect of a claim for damages done to the adjacent land not actually taken; and therefore that "so much, at least, of section 11, as provides for the diminution of the just compensation for the value of the land taken to the extent of benefits accruing to the remainder, is beyond the power of Congress, and therefore void."

2d. That, "in so far as the general principle of the assessment established by section 15 of this act is concerned, there can be no substantial objection; it is fair, liberal and regular"; but that "section 15 is inoperative by failure to conform to the necessary operation of sections 6 and 7. To accomplish the object of speedy condemnation and rectification of streets in localities, where important, some provision should have been made for the creation of definite taxing districts, including one or several subdivisions and sections adjacent, where it might appear to be expedient and just, so that the work of condemnation, laying off, and assessment of expenses of streets could take place promptly without complication with others. Another defect is that the assessments, when confirmed by the court, shall bear interest from date of such confirmation, notwithstanding the fact that Congress may not accept them, if at all, for a year, possibly, under the provisions of section 18."

3d. "That Congress has made no appropriation for the immediate payment of the compensation that may be assessed does not render the act invalid."

4th. That the invalidity of sections 11 and 15 does not make the act as a whole inoperative and void.

5th. That the record of the maps, provided for in the act, does not amount to "a taking of the land, in the sense that it

interferes with the enjoyment thereof by the owners to an injurious extent, beyond the power of Congress, without a provision for compensation."

The result was that the judgment was reversed, and the cause remanded with directions to modify the judgment in so far as it dismissed the petition, and to reinstate the cause for further proceedings not inconsistent with the opinion of the Court of Appeals.   8 App. D. C. 393.

Chief Justice Alvey filed a separate opinion, holding section 11 to be constitutional and valid, and in this respect dissenting from his associates; but substantially concurring in the rest of their opinion, and holding section 15 to be "impossible of execution," and "nugatory for the want of certainty," in the following respects: "This power of assessment for benefits, as given in this section of the act, is without territorial limitation, and may extend into other subdivisions, and the same lots or parcels of land may be subject to assessments by other juries thereafter called upon to make assessments upon land benefited." "It entirely fails to define or prescribe the district or territory within which the benefits may be assessed. Whether confined to the particular subdivision in which the highway or street may be condemned and established, or whether such benefits may be assessed against land beyond the limits of such subdivision along the line of such improvement, as extended into or through adjoining subdivisions, the act is entirely silent. Nor is there any provision conferring authority upon commissioners, or upon the court, to define such taxing district.   And the act wholly fails to provide how the assessment shall be apportioned — whether with reference to the existing value of the land, or to the amount of benefit only that may be derived from the improvement when made." 8 App. D. C. 427–429.

The Supreme Court of the District of Columbia, upon receiving the mandate of the Court of Appeals, set aside the verdict, so far as it allowed or assessed any benefits, and gave judgment thereon, so far as it awarded compensation and damages to the owners of lands.   From this judgment the Commissioners, as well as one of the land-owners, appealed to the

Court of Appeals, which affirmed the judgment. Both parties took appeals to this court, being Nos. 633 and 634.

Immediately after the original trial of the case of the Dennison and Leighton subdivision, the case of the Ingleside subdivision was submitted to the same jury, and a verdict was returned in similar form, which, after the first decision of the Court of Appeals, above mentioned, and in accordance with that decision, was partly set aside, and partly affirmed, by a final judgment of the Supreme Court of the District of Columbia. The Commissioners, as well as some of the land-owners, appealed to the Court of Appeals, which affirmed the judgment ; and both parties took appeals to this court, being Nos. 631 and 632.

The effect of the decision of the Court of Appeals is that the owner of a parcel of land, a right of way over part of which is condemned under this statute, is entitled to recover the full value of the part taken, free of any deduction for special benefits to the remainder, or of any assessment for the general benefits received by it in common with other lands in the neighborhood.

In entering upon the consideration of the correctness of that conclusion, the precedents in the District of Columbia, bearing upon the subject, are significant, especially as showing the practical construction by Congress of the constitutional provision.

In the city of Washington, the lines of streets and avenues and public squares and reservations were defined and established by the original plan of the city; and the absolute and unqualified title in fee in the lands within those lines was vested in the United States by deeds of conveyance from the proprietors of the lands, or by proceedings of condemnation under statutes of Maryland, upon the original laying out of the city. Burch's Digest, 217–224, 330, 337; Comp. Stat. D. C. pp. 654–660; *Van Ness* v. *Washington*, 4 Pet. 232; *Potomac Steamboat Co.* v. *Upper Potomac Steamboat Co.*, 109 U. S. 672, 680, 681; *District of Columbia* v. *Baltimore & Potomac Railroad*, 114 U. S. 453, 460. Congress, therefore, had little or no occasion to provide for the taking of lands,

under the right of eminent domain, for streets and highways within the city of Washington.

But Congress early began to legislate on the subject of laying out streets and highways in other parts of the District of Columbia, and to provide both for taking into consideration benefits as well as injuries in the assessment of damages sustained by owners of lands, and for assessing and charging upon the persons and lands benefited the amount of such damages.

Georgetown was incorporated under the statute of Maryland of 1789, c. 23, amended by the statute of 1797, c. 56. 2 Kilty's Stat. Two early acts of Congress, amending the charter of Georgetown, contained provisions for the opening and extension of streets, as follows:

By the act of Congress of March 3, 1805, c. 32, § 12, the corporation of Georgetown was empowered, in general terms, "to open, extend and regulate streets within the limits of said town; provided they make to the person or persons, who may be injured by such opening, extension or regulation, just and adequate compensation, to be ascertained by the verdict of an impartial jury, to be summoned and sworn by a justice of the peace of the county of Washington, and to be formed of twenty-three men, who shall proceed in like manner as has been usual in other cases where private property has been condemned for public use." 2 Stat. 335. The usual manner, under the statutes of Maryland, thus referred to, of estimating the compensation or damages to be awarded to the owners of land for opening or extending a street, had been by inquiring what damages they would "actually suffer from the passing of the road over the land," "taking into consideration all conveniences and inconveniences, advantages and disadvantages, arising thereby," or "all benefits and inconveniences." Herty's Digest, (1799) p. 459; Maryland Stats. 1790, c. 32, § 8; 1798, c. 77, § 4; 1799, c. 32, § 2; 1792, c. 27, § 3; 1798, c. 19, § 3; 2 Kilty's Stat.

The supplementary act of March 3, 1809, c. 30, after defining anew the limits of Georgetown, provided in section 4 as follows: "The said corporation shall have power to lay out, open, extend and regulate streets, lanes and alleys, within the

limits of the town, as before described, under the following regulations, that is to say: the mayor of the town shall summon twelve freeholders, inhabitants of the town, not directly interested in the premises, who, being first sworn to assess and value what damages would be sustained by any person or persons by reason of the opening or extending any street, lane or alley, (taking all benefits and inconveniences into consideration,) shall proceed to assess what damages would be sustained by any person or persons whomsoever, by reason of such opening or extension of the street, and shall also declare to what amount in money each individual benefited thereby shall contribute and pay towards compensating the person or persons injured by reason of such opening and extension; and the names of the person or persons so benefited, and the sums which they shall respectively be obliged to pay, shall be returned under their hands and seals to the clerk of the corporation, to be filed and kept in his office; and the person or persons benefited by opening or extending any street, and assessed as aforesaid, shall respectively pay the sums of money so charged and assessed to them, with interest thereon at the rate of six per cent per annum, from the time limited for the payment thereof until paid; and the sums of money assessed and charged in manner aforesaid to each individual benefited in manner aforesaid shall be a lien upon and bind all the property so benefited to the full amount thereof: Provided always, that no street, lane or alley shall be laid out, opened or extended, until the damages assessed to individuals in consequence thereof, shall have been paid, or secured to be paid." 2 Stat. 537, 538.

That provision of that act, in its leading features, was singularly like the act of 1893 now in question. Like this act, it provided that the jury, in assessing the damages sustained by any person by reason of the opening or extension of a street, should take into consideration the benefits to him; that the same jury, which assessed the damages, should also ascertain what landowners were benefited by the opening or extension, and what sums they should respectively pay towards the damages; that these sums should be a lien on the property benefited, and should bear interest until paid; and that the street should

not be laid out, opened or extended, until the damages were paid or secured. The act of March 3, 1809, has more than once been brought before this court, without a doubt of its constitutionality being expressed. *Goszler* v. *Georgetown*, (1821) 6 Wheat. 593; *Hannewinkle* v. *Georgetown*, (1872) 15 Wall. 547.

In later acts authorizing the laying out of highways, or the construction of other public improvements, in the District of Columbia, Congress has repeatedly made provision for the deduction of benefits in estimating the compensation to be paid to an owner of land, whether for the value of the part taken, or for damages to the rest, even if the result should be to leave nothing payable to the owner.

The act of Congress of July 1, 1812, c. 117, § 13, authorized the corporations of Washington and Georgetown, or either of them, to build a bridge across Rock Creek; and the mayor to summon a jury of twelve disinterested freeholders, each of whom should be sworn to "justly, faithfully and impartially value all the ground held as private property and intended and required to be used or occupied by reason of the contemplated erection of the permanent bridge, and the amount of damages the proprietor or proprietors of said ground will sustain, (taking into view at the same time the benefits which the said proprietor or proprietors will derive from the erection of the said bridge,) according to the best of his skill and judgment; and the inquisition and valuation thereupon taken shall be signed by the mayor and seven or more of the said jury, and shall be binding and conclusive upon all parties concerned." 2 Stat. 773, 774.

A statute of Virginia of January 27, 1824, incorporating the Chesapeake and Ohio Canal Company, approved and accepted by a statute of Maryland of January 31, 1825, and ratified and confirmed, for the purpose of enabling the corporation to carry into effect the provisions thereof in the District of Columbia, by the act of Congress of March 3, 1825, c. 52, provided, in section 15, that a jury of not less than twelve, out of eighteen summoned for the purpose, should "value the land and all damages the owner thereof shall sus-

tain by cutting the canal through such land, or the partial or temporary appropriation, use or occupation of such land"; and that, "in every such valuation and assessment of damages," the jury should be "instructed to consider, in determining and fixing the amount thereof, the actual benefit which will accrue to the owner from conducting the said canal through, or erecting any of said works upon his land, and to regulate their verdict thereby; except that no assessment shall require any such owner to pay or contribute anything to the said company where such benefit shall exceed, in the estimate of the jury, the value and damages ascertained as aforesaid." 4 Stat. 101, 793, 798, 801.

An inquisition under that act, condemning land in Georgetown for the use of the canal, having been returned into the Circuit Court of the United States for the District of Columbia, was objected to by the owner of the land, upon the ground that no provision had been made for just compensation, as required by the Constitution. Chief Justice Cranch, in overruling the objection, said:

"It is contended, that the Constitution provides a positive, not a conjectural compensation; that under the provisions of this charter, it may happen that no compensation at all may be made; that the expected benefits which the jury shall have estimated may never arrive; and that, therefore, the jury should not have been required, by the charter, to consider them in their estimate of value and damages.

"But the Constitution only provides for the general principle. The means of ascertaining the just compensation were left to be decided by the public authority which should give the power to take the private property for public use. All the States, prior to the adoption of the Constitution, exercised this right, and still continue to exercise it where it is necessary to condemn land for roads and other public uses; and they have generally provided for compensation through the intervention of a jury.

"It is impossible for the legislature to fix the compensation in every individual case. It can only provide a tribunal to examine the circumstances of each case, and to estimate the

just compensation. If the jury had not been required by the charter to consider the benefit, as well as the damage, they would still have been at liberty to do so, for the Constitution does not require that the value should be paid, but that just compensation should be given. Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual; and if the jury should be satisfied that the individual would, by the proposed public work, receive a benefit to the full value of the property taken, it could not be said to be a just compensation to give him the full value. If the jury would have a right to consider the benefit, as well the damage, without the provision of the charter which requires them to do so, the same objection would still exist, namely, that under the provisions of the charter it might happen that no compensation at all, or, at most, a nominal compensation, would be made. The insertion, therefore, of that provision in the charter which requires the jury to do what they would be competent to do without such a provision, and which, in order to ascertain a compensation which should be just towards the public as well as just towards the individual, they ought to do, cannot be considered as repugnant to the Constitution." *Chesapeake & Ohio Canal* v. *Key*, (1829) 3 Cranch C. C. 599, 601.

A year later, a similar inquisition returned into the same court was objected to, because the jury had not found the value of the land and the damages separately, but had included both in one sum. To which Chief Justice Cranch, after reading the provision of the statute, above quoted, answered: " The benefits to be derived, therefore, may be as well set off against the value of the land as against the damages, and we see no reason why the jury may not find the result in one entire sum." *Chesapeake & Ohio Canal* v. *Union Bank of Georgetown*, (1830) 4 Cranch C. C. 75, 80.

The very words of that provision were repeated in section 13 of the act of Congress of May 26, 1830, c. 104, incorporating the Alexandria Canal Company. 6 Stat. 419, 424.

This legislation of Congress, and these decisions of the Circuit Court of the District of Columbia, authorizing the setting

off of benefits against the value of land taken, as well as against additional damages, for the construction of a canal, are in accord with the statement of Chief Justice Waite, speaking for this court, in 1881, that the construction of a canal "might confer benefits that would be a just compensation for the private property taken for its use." *Kennedy* v. *Indianapolis*, 103 U. S. 599, 605.

From 1812 to 1890, a period of more than three quarters of a century, the general acts of Congress, authorizing the laying out or altering of public roads in the District of Columbia, outside the cities of Washington and Georgetown, expressly provided for the deduction of benefits in the assessment of damages to the owners of lands.

By section 2 of the act of July 1, 1812, c. 117, the levy court of the county of Washington was authorized to lay out, straighten and repair such public roads ; and by section 3 a warrant might be issued to the marshal of the District of Columbia to summon a jury of twelve disinterested freeholders, and to administer to each of them an oath to "justly, faithfully and impartially value the land and all damages the owner thereto will sustain by the road passing through the same, having regard to all circumstances of convenience, benefit or disadvantage, according to the best of his skill and judgment; and the inquisition thereupon taken shall be signed by the marshal and seven or more of the said jury, and shall be conclusive." 2 Stat. 771, 772. Like proceedings for the condemnation of lands were provided for in the similar act of May 3, 1862, c. 63, § 5 ; 12 Stat. 384.

In 1863, the same court, whenever it should "deem it conducive to the public interests. to open a new road, or change the course of an old one," was authorized to order the route to be surveyed, and the road to be recorded and opened ; and to direct the marshal "to summon a jury of seven judicious disinterested men, not related to any party interested, to be and appear on the premises on a day specified to assess the damages, if any, which each owner of land through which the road is to pass may sustain by reason thereof " ; " but in doing this they shall take into consideration the benefit it

may be to him or her by enhancing the value of his or her land, or otherwise, and give their verdict accordingly," signed by the jury, or by a majority of them, and attested by the marshal. If the court or any land-owner was dissatisfied with that verdict, the matter might be submitted to a jury of twelve, proceeding as before, the verdict of whom, or of a majority of whom, was final. Act of March 3, 1863, c. 106, § 8; 12 Stat. 801, 802.

By the act of May 9, 1866, c. 76, empowering the levy court "to declare and locate as public highways such roads known and used as military roads in said district during the rebellion, as said court may deem advisable," " the damages which the owners of the land over which said roads pass shall sustain by reason of said roads being declared public highways" were to be assessed as provided in the act of July 1, 1812, c. 117, § 3, above quoted. 14 Stat. 45.

In 1871, upon the creation of a government for the District of Columbia, with a governor and a legislative assembly, the levy court was abolished, and its powers over public roads under the act of 1863 were vested in the board of public works. Act of February 21, 1871, c. 62, §§ 1, 18, 40; 16 Stat. 419, 423, 428; Laws of D. C. of 1871, c. 76, § 2. In 1874, when all provisions of law providing for a governor, a legislative assembly and a board of public works in the District of Columbia were repealed, the provisions of the act of 1863 upon the subject of highways were substantially reënacted, substituting "the proper authorities" for the levy court, in the Revised Statutes of the District of Columbia, chapter 11, §§ 252–265; it being provided in section 260 of these statutes that the jury should "decide what damages, if any, each owner may sustain by reason of running the road through his premises," and in section 261 that "in making their decision the jury shall take into consideration the benefit such road may be to each owner by enhancing the value of his land, or otherwise, and shall give their verdict accordingly." By subsequent acts, the powers of the board of public works have been vested in the Commissioners of the District of Columbia. Acts of June 20, 1874, c. 337, §§ 1, 2; 18 Stat.

116; June 11, 1878, c. 180, § 2; 20 Stat. 103; Comp. Stat. D. C. c. 29.

Again, by the act of April 15, 1886, c. 50, § 4, authorizing the construction of the Congressional Library Building, the damages occasioned by the taking of land for that purpose were to be ascertained and assessed " in the manner provided with reference to the taking of land for highways in the District of Columbia," that is to say, according to chapter 11 of the Revised Statutes of the District. 24 Stat. 13.

By the act of August 30, 1890, c. 837, § 3, it was provided that " the value of the interests of all persons, respectively," in land taken for the enlargement of the Government Printing Office, should be appraised by three commissioners appointed by the Supreme Court of the District of Columbia, upon the application of the special board created by the act; and it was further provided that thereafter, " in all cases of the taking of property in the District of Columbia for public use," the like proceedings should be had upon the application of the proper officers. 26 Stat. 413. But the object of these provisions would appear to have been to make a change only in the persons who should assess the compensation, not in the rule of assessment. And by the act of August 7, 1894, c. 232, it was enacted that section 3 of the act of 1890 should " not be construed to apply to the condemnation of land for public highways, nor to repeal chapter 11 of the Revised Statutes of the United States relating to the District of Columbia, in regard to public highways, roads and bridges." 28 Stat. 251.

The power of Congress, exercising the right of eminent domain within the District of Columbia, to provide for the deduction of benefits from the compensation or damages for taking part of a parcel of land and injuring the rest, does not appear ever to have been judicially questioned until it was denied by a majority of the Court of Appeals of the District of Columbia within the last two or three years. *District of Columbia* v. *Prospect Hill Cemetery*, 5 App. D. C. 497; *Maryland & Washington Railway* v. *Hiller*, 8 App. D. C. 289; *District of Columbia* v. *Armes*, 8 App. D. C. 393.

The position thus assumed by the majority of that court is

not only against the uniform course of previous legislation and decision in the District of Columbia, but it is opposed to the great preponderance of the authorities elsewhere.

In the Fifth Article of the earliest amendments to the Constitution of the United States, in the nature of a Bill of Rights, the inherent and necessary power of the Government to appropriate private property to the public use is recognized, and the rights of private owners are secured, by the declaration, " nor shall private property be taken for public use without just compensation."

The right of eminent domain, as was said by this court, speaking through the Chief Justice, in a recent case, " is the offspring of political necessity, and is inseparable from sovereignty unless denied to it by its fundamental law. It cannot be exercised, except upon condition that just compensation shall be made to the owner; and it is the duty of the State, in the conduct of the inquest by which the compensation is ascertained, to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it." *Searl* v. *Lake County School District,* 133 U. S. 553, 562. The just compensation required by the Constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.

Consequently, when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition, as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened. If, for example, by the widening of a street, the part which lies next the

street, being the most valuable part of the land, is taken for the public use, and what was before in the rear becomes the front part, and upon a wider street, and thereby of greater value than the whole was before, it is neither just in itself, nor required by the Constitution, that the owner should be entitled both to receive the full value of the part taken, considered as front land, and to retain the increase in value of the back land, which has been made front land by the same taking.

Of the overwhelming number of decisions in the courts of the several States, which support this view, a few of the most important may conveniently be referred to.

By the Declaration of Rights prefixed to the constitution of Massachusetts, established in 1780, " whenever the public exigencies require that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor." Mass. Const. pt. 1, art. 10. By the statute of Massachusetts of 1786, c. 67, § 4, the court of sessions, upon determining it " to be of common convenience or necessity " that a new highway or common road should be laid out, or an old one altered, was authorized to appoint " a committee of five disinterested sufficient freeholders, in the same county, to lay out such highway or road," " according to their best skill and judgment, with most convenience to the public, and least prejudice or damage to private property " ; and it was provided that " if any person be damaged in his property, by the laying out or altering such highway," the town in which the way was should make him " reasonable satisfaction, according to the estimation of the committee, or the major part of them " ; and any person " aggrieved by the doings of the said committee, in locating said way, or in estimating damages," might have their doings, in both respects, reviewed by a sheriff's jury. Although that statute made no mention of benefits, the Supreme Judicial Court of the State, in 1807, speaking by Chief Justice Parsons, and laying down " the principles of law which ought to direct these proceedings," said : " In estimating the damages, the committee are not confined to the value of the land covered by the road,

and the expense of fencing the ground. The owner may suffer much greater damage by the road depriving him of water, or by otherwise rendering the cultivation of his farm inconvenient and laborious; or it may happen that the new highway may essentially benefit his farm, and that he may suffer very little or no injury by the location. The estimation ought, therefore, to be according to the damage which the owner will, in fact, sustain in his property by the opening of the road." *Commonwealth* v. *Coombs*, 2 Mass. 489, 491.

The same rule was recognized in *Commonwealth* v. *Norfolk Sessions*, 5 Mass. 435, and in *Commonwealth* v. *Middlesex Sessions*, 9 Mass. 388; and, after being constantly acted on in Massachusetts, was embodied in the Revised Statutes of 1836, in this form: "In estimating the damages sustained by any person in his property, by the laying out, altering or discontinuing of any highway, the jury shall take into consideration all the damage done to the complainant, whether by taking his property, or by injuring it in any manner; and they shall also allow, by way of set-off, the benefit, if any, to the property of the complainant, by reason of such laying out, alteration or discontinuance." Those statutes also provided that damages occasioned by the laying out and maintaining of a railroad should be estimated in the manner provided in the case of laying out highways. Mass. Rev. Stat. c. 24, § 31; c. 39, § 56. And both provisions have been reënacted in successive revisions of the statutes. Gen. Stat. of 1860, c. 43, § 16; c. 63, § 21; Pub. Stat. of 1882, c. 49, § 16; c. 112, § 95.

In 1849, the Supreme Judicial Court of Massachusetts, in an opinion delivered by Mr. Justice Dewey, with the concurrence of Chief Justice Shaw and Justices Wilde, Metcalf and Fletcher, held that, in estimating the damages for the taking of land for a railroad, any direct and peculiar benefit, or actual increase of value, thereby caused to land of the same owner, adjoining or connected with the land taken, and forming part of the same parcel or tract, was to be considered and allowed by way of set-off, and in reduction of damages; but not any general benefit or increase of value to be occasioned

to such land, in common with all the lands in the neighborhood, by the establishment of the railroad and the facilities connected therewith. The conclusion of the court was summed up as follows: "The respondents are not to have the benefit of any increase in value of the petitioner's adjacent land, so far as he has been benefited by the railroad, merely in common with all the citizens of the neighborhood or village, by the anticipated general rise of property, by reason of the railroad's passing through the town and in the vicinity of their lands. It is only the increased value of the land of the petitioner, arising from the location of the road over some part of it, which is to be taken into consideration. If such location over the land of the petitioner has raised the value of his adjacent lands, then a reduction or offset is to be allowed the respondents on that account. It is the increase of value occasioned by the location, and of course has reference to the state of things existing at the time when the land is taken by the location." *Meacham* v. *Fitchburg Railroad,* 4 Cush. 291, 298, 299. The rule as thus qualified has ever since been applied in Massachusetts to highways. *Allen* v. *Charlestown,* 109 Mass. 243; *Hilbourne* v. *Suffolk,* 120 Mass. 393; *Cross* v. *Plymouth,* 125 Mass. 557.

In New York, the courts have gone beyond this in allowing benefits to be taken into consideration in diminution of compensation or damages for land taken for a highway. The constitution of 1821, art. 7, sect. 7, declared, in the very words of the Fifth Amendment of the Constitution of the United States, "nor shall private property be taken for public use without just compensation." The Court of Errors, in 1831, affirming a judgment of the Supreme Court of the State, held that the benefit accruing to the owner of land taken for a street in the city of New York, by the increased value of adjacent lands belonging to him, might be set off against the loss or damage caused to him by the taking, and, if equal to such loss or damage, was a just compensation for the land taken; and Chancellor Walworth, delivering the leading opinion, said: "The owner of the property taken is entitled to a full compensation for the damage he sustains thereby; but if the taking of his

property for the public improvement is a benefit rather than an injury to him, he certainly has no equitable claim to damages. Besides, it is a well settled principle, that where any particular county, district or neighborhood is exclusively benefited by a public improvement, the inhabitants of that district may be taxed for the whole expenses of the improvement, and in proportion to the supposed benefit received by each. In this case, if the whole value of the property taken for a street in the city of New York is allowed to the individual owner, the proprietors of the adjacent lots must be assessed for the purpose of paying that amount, and if the individual whose property is taken is the owner of a lot adjacent, that lot must be assessed ratably with others. It therefore makes no difference whether he is allowed the whole value of the property taken in the first instance, and is assessed for his portion of the damage, or whether the one sum is offset against the other in the first place, and the balance only is allowed." *Livingston* v. *New York*, 8 Wend. 85, 101, 102. That decision appears to have since been considered as establishing that both special and general benefits from the laying out of a street may be set off against the value of the part taken, as well as against the damages to the remainder. *In re Furman Street*, 17 Wend. 649, 659, 671; *People* v. *Brooklyn*, 4 N. Y. 419, 435; *Granger* v. *Syracuse*, 38 How. Pract. 308; *Genet* v. *Brooklyn*, 99 N. Y. 296, 305; *Eldridge* v. *Binghampton*, 120 N. Y. 309, 313; *Bohm* v. *Metropolitan Railroad*, 129 N. Y. 576, 586.

In New Jersey, in a very recent case, a statute authorizing the taking of land for a highway, and directing the commissioners " to make a just and equitable estimate and appraisement of the compensation and damages each owner of the real estate and land to be taken will sustain by reason of such taking, considering in such appraisal the condition in which each owner's parcel will be left after taking so much thereof as will be necessary for said opening, and the benefits that will result from such road to the owner or owners of such land and real estate," was held by the Supreme Court, in an opinion delivered by Mr. Justice Dixon, to be consistent

with the provision of the constitution of 1844, art. 1, sect. 16, that "private property shall not be taken for public use, without just compensation," for these reasons: "Just compensation for taking part of an entire tract of land for public use cannot, we think, be ascertained without considering all the proximate effects of the taking. These are the withdrawal of the part taken from the dominion of the former owner, the damage done to the residue by the separation, and the benefit immediately accruing to the residue from the devotion of the part taken to a certain public use. Just compensation is ascertained by combining the pecuniary value of all these facts; if any be excluded, what is given is more or less than is just. The value of the land taken is no more essential to just compensation than is satisfaction for the damage done to the residue, nor is it more exempt from diminution on account of benefits conferred. There is, however, a possibility of benefit to accrue from certain public uses for which land is taken, like the opening of highways, which should not be considered, for two reasons: first, because this benefit is to arise, if at all, in the indefinite future, while the compensation must be such as is just at the time of the taking; second, because it is so uncertain in character as to be incapable of present estimation. Such benefit is that which may spring from the growth of population, if it should be attracted by the public improvement for which the land is taken, and from similar sources. It is usually styled general benefit, because it affects the whole community or neighborhood. But any benefit, which accompanies the act of taking the land for the contemplated use, and which admits of reasonable computation, may enter into the award." *Mangles* v. *Hudson Freeholders*, 26 Vroom (55 N. J. Law), 88, 92. The like rule has been upheld by the Court of Errors in the case of a railroad. *Packard* v. *Bergen Neck Railway*, 25 Vroom (54 N. J. Law), 553.

In Pennsylvania, the constitution of 1790, art. 9, sect. 10, declared, "nor shall any man's property be taken or applied to public use," "without just compensation being made"; and that provision, without material change, has been retained in

the constitution of 1838, art. 9, sect. 10, and in that of 1873, art. 1, sect. 10. The rule of compensation was tersely stated by Chief Justice Gibson, in 1821, as follows: "The jury are to consider the matter just as if they were called on to value the injury at the moment when compensation could first be demanded; they are to value the injury to the *property*, without reference to the person of the owner, or the actual state of his business; and in doing that, the only safe rule is, to inquire what would the property unaffected by the obstruction have sold for, at the time the injury was committed? What would it have sold for as affected by the injury? The difference is the true measure of compensation." *Schuylkill Navigation Co.* v. *Thoburn*, 7 S. & R. 411, 422. The rule, as thus stated, was recognized by Mr. Justice Strong in *Watson* v. *Pittsburgh & Connellsville Railroad*, 37 Penn. St. 469, 481; and in accordance therewith it has been uniformly held that when part of a parcel of land is taken, direct and special benefits to the rest of the same parcel, beyond the general increase in the value of property in the neighborhood, are to be deducted. *Plank Road Co.* v. *Rea*, 20 Penn. St. 97; *Railway Co.* v. *McCloskey*, 110 Penn. St. 436; *Setzler* v. *Pennsylvania &c. Railroad*, 112 Penn. St. 56; *Long* v. *Harrisburg &c. Railroad*, 126 Penn. St. 143.

In Ohio, under the constitution of 1802, art. 8, sect. 4, which declared, "private property ought and shall ever be held inviolate, but always subservient to the public welfare, provided a compensation in money be made to the owner," the Supreme Court of the State, in 1846, held that, in assessing the compensation for the taking of part of a lot of land for widening a street, benefits resulting from the improvement to the residue of the lot, might be set off; and said: "That just, full and adequate *compensation* must be made, and *in money*, is certain; more cannot be required; but if, in appropriating property of the value of $4000, when, by the same appropriation, the value of what remains is increased $2000, and the value of the property taken is the rule of damages, the owner actually takes $2000 without the least consideration, and receives more than the constitution enjoins to be paid, because

it is more than a *compensation.* The word *compensation* imports that a wrong or injury has been inflicted, and which must be redressed .in money. Money.must be paid to the extent of the injury, whether more or less than the value of the property ; and then, in. our view, is the language of the constitution satisfied. We are confirmed in our opinion of the correctness of the. construction we place on the word *compensation,* as employed in the constitution, from the fact that such construction has obtained and been acquiesced in; from a period not far short of the organization of the state government. In the opening of roads, constructing turnpikes and appropriating lands for canals, benefits conferred have been constantly and unceasingly deducted from the value of the property, or damages otherwise sustained. Long contemporaneous construction of an instrument is seldom erroneous, and is always deserving of great consideration, when the meaning of the instrument is obscure." *Symonds* v. *Cincinnati,* 14 Ohio, 147, 174, 175. . The same rule was followed so long as the constitution of 1802 was in force. *Brown* v. *Cincinnati,* 14 Ohio, 541 ; *Kramer* v. *Cleveland & Pittsburgh Railroad,* 5 Ohio St. 140 ; *Columbus &c. Railroad* v. *Simpson,* 5 Ohio St. 251.

The rule upon the subject was expressed by Mr. Justice Brewer, when a member of the Supreme Court of the State of Kansas, as follows : " Outside of any special constitutional or statutory restrictions, the right of the State to take private property for public use, and the corresponding right of the individual to receive compensation for the property thus taken, may be assumed." " But this compensation is secured if the individual receive an amount which, with the direct benefits accruing, will equal the loss sustained by the appropriation. We of course exclude the indirect and general benefits which result to the public as a whole, and therefore to the individual as one of the public ; for he pays in taxation for his share of such general benefits. But if the proposed road or other improvement inure to the direct and special benefit of the individual out of whose property a part is taken, he receives something which none else of the public receive, and it is just

that this should be taken into account in determining what is compensation. Otherwise, he is favored above the rest, and, instead of simply being made whole, he profits by the appropriation, and the taxes of the others must be increased for his special advantage. Upon general principles, then, and with due regard to right and justice, it should be held that the public may show what direct and special benefits accrue to an individual claiming road damages, and that these special benefits should be applied to the reduction of the damages otherwise shown to have been sustained." "The word 'damages' is of general import, and is equivalent to compensation. It includes more than the mere value of the property taken, for often the main injury is not in the value of the property absolutely lost to the owner, but in the effect upon the balance of his property of the cutting out of the part taken. He is damaged, therefore, more than in the value of that which is taken. Conversely, the appropriation of the part taken to the new uses for which it is taken may operate to the direct and special improvement and benefit of that not taken. Surely, this direct increase in value, this special benefit resulting from the improvement the public is making, and for which it must be taxed, reduces the damages he has sustained." . *Pottawatomie Commissioners* v. *O'Sullivan*, 17 Kansas, 58–60. And the rule has been applied where the special benefits equalled or exceeded the damages, so that the owner of the land received nothing. *Tobie* v. *Brown Commissioners*, 20 Kansas 14 ; *Trosper* v. *Sabine Commissioners*, 27 Kansas, 391.

Nothing inconsistent with this view was decided or intimated in the opinion of this court, delivered by Mr. Justice Brewer, in *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312. All that was there said upon this subject was as follows : " The 'just compensation' is to be a full equivalent for the property taken. This excludes the taking into account, as an element in the compensation, any supposed benefit that the owner may receive in common with all from the public uses to which his private property is appropriated ; and leaves it to stand as a declaration that no private property

shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner. We do not in this refer to the case where only a portion of a tract is taken, or express any opinion on the vexed question as to the extent to which the benefits or injuries to the portion not taken may be brought into consideration." 148 U. S. 326. And on the next page the opinion of the Supreme Court of Mississippi in *Isom* v. *Mississippi Central Railroad*, 36 Mississippi, 300, was referred to and quoted from, not by way of endorsing the peculiar views expressed by that court in another part of its opinion upon the subject of benefits, but only in support of the general proposition that, while the question what property is needed for public purposes is to be determined by the legislature, the ascertainment of what is just compensation is a judicial inquiry. See *Marchant* v. *Pennsylvania Railroad*, 153 U. S. 380, 385; *Chicago, Burlington & Quincy Railroad* v. *Chicago*, 166 U. S. 226.

The case, just decided, of *Spokane Falls & Northern Railway* v. *Ziegler*, *ante*, 65, in which the owner of a tract of land, part of which was taken for a railroad, and the rest thereby injured, was allowed to recover against the railroad corporation the full value of the land taken, and also the difference in market value of the part left, "irrespective of the effect on the market value by reason of the building of the road," was governed by the express provision of § 2456 of the Code of Washington Territory, afterwards embodied in art. 1, sect. 16, of the constitution of the State of Washington, requiring, in such a case, compensation to be made, "irrespective of any benefit from any improvement proposed by such corporation." See *Spokane Falls & Northern Railway* v. *Ziegler*, 15 U. S. App. 472, 478; *Enoch* v. *Spokane Falls & Northern Railway*, 6 Wash. St. 393.

The careful collection and classification of the cases upon this subject in Lewis on Eminent Domain, §§ 465–471, shows that in the greater number of the States, unless expressly forbidden by constitution or statute, special benefits are allowed to be set off, both against the value of the part taken, and against damages to the remainder; that in some of those

States general benefits also are allowed to be thus set off; that in comparatively few States both kinds of benefits, or at least special benefits, are allowed to be set off against damages to the remainder, but not against the value of the part taken; and that in Mississippi alone benefits are not allowed to be considered at all. See also Cooley. Const. Lim. (6th ed.) 697–702; 2 Dillon Mun. Corp. (4th ed.) §§ 624, 625; Randolph on Eminent Domain, §§ 254–273.

The Constitution of the United States contains no express prohibition against considering benefits in estimating the just compensation to be paid for private property taken for the public use; and, for the reasons and upon the authorities above stated, no such prohibition can be implied; and it is therefore within the authority of Congress, in the exercise of the right of eminent domain, to direct that, when part of a parcel of land is appropriated to the public use for a highway in the District of Columbia, the tribunal vested by law with the duty of assessing the compensation or damages due to the owner, whether for the value of the part taken, or for any injury to the rest, shall take into consideration, by way of lessening the whole or either part of the sum due him, any special and direct benefits, capable of present estimate and reasonable computation, caused by the establishment of the highway to the part not taken.

The suggestion, made at the bar, that section 11 of the act in question, as applied to a proceeding under section 6 relating to an existing subdivision, allows the jury to deduct contingent and speculative benefits to arise in the future from the actual opening and improvement of the highways, may be best met by recurring to the general scope of the act.

In the first section, Congress directed the Commissioners of the District of Columbia to prepare a plan for the extension of a permanent system of highways, throughout that part of the District lying outside of the cities of Washington and George-town, in conformity, as nearly as practicable, with the general plan of the city of Washington.

But Congress evidently recognized the importance, for the efficient execution of its scheme, and for the avoidance of un-

necessary expenditures, to begin by dealing with those localities where subdivisions had been made and streets laid out by the owners of the land, regardless of the general plan; and to leave the completion of the system through other parts of the District, in which the land had not been subdivided, and comparatively few streets had been laid out, to be dealt with afterwards.

The Commissioners, therefore, by section 2, were required to prepare their plan of extension in sections, beginning with the areas covered by existing suburban subdivisions not in conformity with the general plan of the city of Washington, and to prepare maps of those sections; and, by section 6, were required, within thirty days after the record of any such map which should alter or dispense with any highway in any then existing subdivision in the area included in the map, to present a petition to the court for condemnation of a permanent right of way for the public over all lands within that subdivision, not already owned by the United States or the District of Columbia or dedicated to public use as a highway. And by section 7, petitions as to lands not within existing subdivisions might be presented to the court at any time thereafter.

The only substantial difference between proceedings for condemnation of a public right of way over lands within an existing subdivision, under section 6, and over lands not within an existing subdivision, under section 7, is that, as to lands within an existing subdivision, the petition to the court must be presented within thirty days after the recording of the map, and the court is then to proceed with the condemnation — Congress, in effect, itself determining that the public convenience requires the immediate establishment of the new highways — while, as to lands not within any existing subdivision, the petition to the court may be presented at any time thereafter, and is not to be presented, nor any condemnation made, until the Commissioners and the court, respectively, have determined that the public convenience requires the immediate opening of the highways in question. Although the word "opening" does not occur in section 6, while it is used

in section 7, yet the authority of the court, as defined in either section, is only "to condemn a permanent right of way for the public" over the lands in question, and does not include the actual laying out and construction of the new highways. Condemnation, and nothing more, is likewise mentioned in the corresponding provisions of section 9.

The provisions of section 8, as to notice to parties interested, and of sections 10–13, as to the summoning and organization of a jury of seven, and as to their duties in assessing the compensation or damages to land-owners, including the provision of section 11 for considering benefits in the assessment of damages, are in terms applicable alike to proceedings under section 6 and under section 7.

So are the provisions of section 15, which direct the compensation awarded to be assessed and charged, one half upon the lands benefited, and the other half upon the District of Columbia; and which, in the use of the various phrases, "highway condemned and established under this act," "laying out and opening of such highway," or simply "opening of any highways," evidently treat condemnation, establishment, laying out and opening of a highway as denoting one and the same thing, the appropriation or setting apart of land for a highway and throwing it open to public travel, and have no regard to the actual grading or construction of the highway.

The provisions of the act which relate to the deduction of benefits in assessing compensation or damages are as follows:

Section 11 provides that, "where the use of a part only of any parcel or tract of land shall be condemned in such a proceeding, the jury, in assessing the damages therefor, shall take into consideration the benefit the purpose for which it is taken may be to the owner or owners of such tract or parcel by enhancing the value of the remainder of the same, and shall give their verdict accordingly; and the court may require, in such case, that the damages and the benefits shall be found and stated separately."

Section 13 provides that "the verdict of the jury shall state, as to each parcel of land involved in the proceeding, only the amount of compensation, less the benefits, if any,

which it shall award in respect thereof." And section 15 speaks of the benefits, so deducted, as "the amount, if any, which shall have been deducted from the value of the part taken, on account of the benefit to the remainder of the tract."

Construing section 11 in connection with the rest of the act, the words "the purpose for which it is taken," in the provision that, when the use of a part only of any parcel or tract of land is condemned, the jury, in assessing the damages therefor, shall take into consideration the benefit that "the purpose for which it is taken may be to the owner or owners of such tract or parcel by enhancing the remainder of the same," clearly signify the purpose for which it is condemned, the appropriation of the land for a highway, which is distinct from, and necessarily antecedent to, the actual construction and completion of the way; and the benefits, as well as the damages, to be taken into consideration, are to be estimated as of the date of such appropriation. The damages assessed as of that date constitute the entire compensation for such appropriation of land for a highway, including all injuries resulting from any change of the natural grade required in the actual construction of the highway, and also, it would seem, unless expressly provided otherwise by constitution or statute, any which may be caused by a future change of the grade by the public authorities. *Goszler* v. *Georgetown,* 6 Wheat. 593; *Smith* v. *Washington,* 20 How. 135, 149; *Transportation Co.* v. *Chicago,* 99 U. S. 635; *Chicago* v. *Taylor,* 125 U. S. 161; *Wabash Railroad* v. *Defiance, ante,* 88.

The necessary conclusion is that there is nothing unusual or unconstitutional in the provision of section 11, requiring benefits to be taken into consideration in assessing the compensation or damages to be awarded to the owners of lands affected by the establishment of new highways.

The other principal question in the case is of the constitutionality of section 15, which directs "the amount awarded by said court as damages for each highway or reservation, or part thereof, condemned and established under this act," to be assessed and charged, one half upon the lands benefited

thereby, and the other half upon the District of Columbia; and, as to the first half, enacts that it "shall be charged upon the lands benefited by the laying out and opening of such highway or reservation, or part thereof"; that "the same jury which shall assess the damages caused by the opening of any highways or reservation, or part thereof, or by the abandonment of an existing highway, or part thereof, shall ascertain and determine what property is thereby benefited, and shall assess against each parcel which it shall find to be so benefited its proper proportional part of the whole of said one half of the damages: Provided, that in making such assessment for benefits the jury shall, as to any tract a part of which shall have been taken for such highway or reservation, or part thereof, make due allowance for the amount, if any, which shall have been deducted from the value of the part taken, on account of the benefit to the remainder of the tract"; that "the proceedings of the court and the jury, in making assessments for benefits under this section, shall conform as nearly as is practicable to the foregoing provisions of this act relating to the assessment of damages; and the verdict of the jury, making an assessment under this section as to any parcel of land, shall not be conclusive until the same shall have been confirmed by the court"; and that, "when confirmed by the court, the assessment so made shall be a lien upon the land assessed," and shall be collected as other taxes are collected, "and shall be payable in five equal annual instalments, with interest at the rate of four per centum per annum from the date of the confirmation of the assessment by the court."

The provisions of this section are to be referred, not to the right of eminent domain, but to the right of taxation; and the general principles applicable to this branch of the case have been affirmed by a series of decisions of this court.

It was contended by some of the owners of lands that the public improvement proposed was not of a local character, but was for the advantage of the whole country, and should be paid for by the United States, and not by the District of Columbia, or by the owners of the lands affected by the im-

provement. But it is for the legislature, and not for the judiciary, to determine whether the expense of a public improvement should be borne by the whole State, or by the district or neighborhood immediately benefited. The case, in this respect, comes within the principle upon which this court held that the legislature of Alabama might charge the county of Mobile with the whole cost of an extensive improvement of Mobile harbor; and, speaking by Mr. Justice Field, said: "The objection urged is that it fastens upon one county the expense of an improvement for the benefit of the whole State. Assuming this to be so, it is not an objection which destroys its validity. When any public work is authorized, it rests with the legislature, unless restrained by constitutional provisions, to determine in what manner the means to defray its cost shall be raised. It may apportion the burden ratably among all the counties or other particular subdivisions of the State, or lay the greater share or the whole upon that county or portion of the State specially and immediately benefited by the expenditure." *Mobile County* v. *Kimball,* 102 U. S. 691, 703, 704.

The legislature, in the exercise of the right of taxation, has the authority to direct the whole, or such part as it may prescribe, of the expense of a public improvement, such as the establishing, the widening, the grading or the repair of a street, to be assessed upon the owners of lands benefited thereby. *Davidson* v. *New Orleans,* 96 U. S. 97; *Hagar* v. *Reclamation District,* 111 U. S. 701; *Spencer* v. *Merchant,* 125 U. S. 345, 355, 356; *Walston* v. *Nevin,* 128 U. S. 578, 582; *Lent* v. *Tillson,* 140 U. S. 316, 328; *Illinois Central Railroad* v. *Decatur,* 147 U. S. 190, 198, 199; *Paulsen* v. *Portland,* 149 U. S. 30. This authority has been repeatedly exercised in the District of Columbia by Congress, with the sanction of this court. *Willard* v. *Presbury,* 14 Wall. 676; *Mattingly* v. *District of Columbia,* 97 U. S. 687; *Shoemaker* v. *United States,* 147 U. S. 282, 286, 302.

The class of lands to be assessed for the purpose may be either determined by the legislature itself, by defining a territorial district, or by other designation; or it may be left by

the legislature to the determination of commissioners, and be made to consist of such lands, and such only, as the commissioners shall decide to be benefited. *Spencer* v. *Merchant,* and *Shoemaker* v. *United States,* above cited; *Fallbrook District* v. *Bradley,* 164 U. S. 112, 167, 168, 175, 176; *Ulman* v. *Baltimore,* 165 U. S. 719. See also the very able opinion of the Court of Appeals of New York, delivered by Judge Ruggles, in *People* v. *Brooklyn,* 4 N. Y. 419, 430.

The rule of apportionment among the parcels of land benefited also rests within the discretion of the legislature, and may be directed to be in proportion to the position, the frontage, the area or the market value of the lands, or in proportion to the benefits as estimated by commissioners. *Mattingly* v. *District of Columbia, Spencer* v. *Merchant, Walston* v. *Nevin, Shoemaker* v. *United States, Paulsen* v. *Portland,* and *Fallbrook District* v. *Bradley,* above cited.

If the legislature, in taxing lands benefited by a highway, or other public improvement, makes provision for notice, by publication or otherwise, to each owner of land, and for hearing him, at some stage of the proceedings, upon the question what proportion of the tax shall be assessed upon his land, his property is not taken without due process of law. *Davidson* v. *New Orleans, Spencer* v. *Merchant, Walston* v. *Nevin, Lent* v. *Tillson, Paulsen* v. *Portland,* and *Fallbrook District* v. *Bradley,* above cited.

The whole sum directed by section 15 to be assessed upon lands benefited is one half of " the amount awarded by said court as damages for each highway or reservation, or part thereof, condemned and established under this act." This fixing of the gross sum to be assessed was clearly within the authority of Congress, according to the above cases.

The class of lands to be assessed is defined by directing that the aforesaid sum "shall be charged upon the lands benefited by the laying out and opening of such highway or reservation, or part thereof," and that the jury "shall ascertain and determine what property is thereby benefited." And the rule of assessment is defined by the further direction that the jury " shall assess against each parcel which it shall

find to be so benefited its proper proportional part of" the sum aforesaid, with a proviso that, as to any tract, part of which only has been taken, due allowance shall be made "for the amount, if any, which shall have been deducted from the value of the part taken, on account of the benefit to the remainder of the tract."

It was argued that section 15 was t. o uncertain to be put in execution, because it failed to define the district or territory within which the benefits might be assessed, and did not even specify whether the assessment should or should not be confined to lands within the particular subdivision in which a new highway was established. But in either alternative the assessment could not include lands outside of the District of Columbia; and the section would be equally constitutional whether the district of assessment was the particular subdivision, or the whole District of Columbia. And there does not appear to be any uncertainty as to which alternative was in the contemplation of Congress. The lands to be assessed being described generally as "the lands benefited" by the condemnation and establishment of the new highway, or by the abandonment of an existing highway, and again as the "property thereby benefited," and as the lands which the jury "find to be so benefited," without any words of restriction to lands in the particular subdivision, the reasonable inference is that all lands so benefited, lying within the exclusive jurisdiction of Congress over the District of Columbia, may be included in the assessment. The question what parcels of lands, within the district so ascertained, are benefited, and therefore liable to be assessed, might justly and constitutionally, as appears by the cases above cited, be committed by Congress to the determination of the tribunal entrusted with the authority of making this assessment.

Nor can we entertain any serious doubt as to the rule of assessment which is to govern. The directions that the jury "shall ascertain and determine what property is benefited" by the establishment of the highway, and "shall assess against each parcel which it shall find to be so benefited its proper proportional part of" the whole sum directed to be assessed,

making due allowance, when part only of a tract has been taken, for any deduction already made, in the assessment of damages for such taking, "on account of the benefit to the remainder of the tract," reasonably, if not necessarily, imply that the assessment is to be proportional to the benefit, and not to the market value or any other test ; and are equivalent to the words in the Rock Creek Park Act, directing lands in the District of Columbia to be assessed, "as nearly as may be, in proportion to the benefits resulting to such real estate." Act of September 27, 1890, c. 1001, § 6; 26 Stat. 493; *Shoemaker* v. *United States*, above cited.

In support of the judgment below, much reliance was placed upon the opinion of the Supreme Court of New Jersey, delivered by Chief Justice Beasley, in *State* v. *Hudson County Commissioners*, 8 Vroom (37 N. J. Law), 12. But the statute there held unconstitutional left it wholly uncertain whether the cost of the public improvement, or only an undefined part thereof, should be assessed upon the owners of lands benefited; and directed the amount assessed to be apportioned among several townships, without prescribing or indicating any rule of apportionment. Some expressions in the opinion, if wrested from their context, can hardly be reconciled with the decisions of this court, above cited, or with the judgment of the Court of Errors of New Jersey, delivered by Chief Justice Beasley, in a later case, adjudging a statute to be constitutional, which directed the expenses of improving certain public roads to be estimated by commissioners, and to be by them assessed upon lands found by them to be benefited, in proportion to, and to the extent of, the benefit received, and the rest of the expense to be assessed upon the county. *State* v. *Road Commissioners*, 13 Vroom (42 N. J. Law), 608.

It was objected to the validity of section 15, that it commits the assessment of benefits upon lands, whether within or without the particular subdivision, benefited by the establishment of a new highway, to "the same jury" which estimates the compensation or damages, under the previous sections, for taking lands within the subdivision for the purpose of the highway. Some confusion has perhaps arisen from designating

the tribunal of seven men, which is to estimate the damages and to assess the benefits, as " a jury," when it is in truth an inquest or commission, appointed by the court under authority of the act of Congress, and differing from an ordinary jury in consisting of less than twelve persons, and in not being required to act with unanimity. *American Publishing Co.* v. *Fisher*, 166 U. S. 464; *Springville* v. *Thomas*, 166 U. S. 474.

By the Constitution of the United States, the estimate of the just compensation for property taken for the public use, under the right of eminent domain, is not required to be made by a jury; but may be entrusted by Congress to commissioners appointed by a court or by the executive, or to an inquest consisting of .more or fewer men than an ordinary jury. *Custiss* v. *Georgetown & Alexandria Turnpike Co.*, 6 Cranch, 233; *Secombe* v. *Railroad Co.*, 23 Wall. 108, 117, 118; *United States* v. *Jones*, 109 U. S. 513, 519; *Shoemaker* v. *United States*, 147 U. S. 282, 300, 301; *Long Island Co.* v. *Brooklyn*, 166 U. S. 685.

Likewise, in the matter of assessing benefits, under the right of taxation, it is within the discretion of the legislature, as shown by the authorities already referred to upon this subject, to commit the ascertainment of the lands to be assessed, as well as the apportionment of the assessment among the different parcels, to the determination of commissioners appointed as the legislature may prescribe. See also *People* v. *Buffalo*, 147 N. Y. 675.

Whether the estimate of damages and the assessment of benefits shall be entrusted to the same or to different commissioners, is a matter wholly within the decision of the legislature, as justice and convenience may appear to it to require. And there are many precedents for entrusting the performance of both duties to the same persons. Act of March 3, 1809, c. 30, § 4, above cited, 2 Stat. 538; Cooley on Taxation, (2d ed.) 612; *In re Pittsburgh District*, 2 W. & S. 320; *In re Amsterdam Common Council*, 126 N. Y. 158.

It was suggested in argument that section 11, authorizing a deduction of benefits in assessing damages, and section 15, authorizing an assessment for benefits, both fail to make it

certain what benefits are intended, and may subject the land-owner to a double assessment. But, upon a view of all the provisions relating to these matters, the reasonable construction is that the benefits to be taken into consideration and de-ducted, in estimating the compensation or damages under sections 10, 11 and 13, are the special and direct benefits which the appropriation of part of a tract of land for a high-way may cause to the remainder of the tract; and that the benefits for which an assessment is to be made under section 15, upon such remainders and upon all other lands benefited, are the general benefits accruing to all lands in the neighbor-hood from the establishment of the highway; and section 15 carefully guards against the possibility of a double assess-ment, by directing the jury, in assessing benefits under this section, " to make due allowance for the amount, if any, which shall have been deducted from the value of the part taken, on account of the benefit to the remainder of the tract." Both the award of damages and the assessment of benefits are to be made by the jury of seven under the supervision of the Supreme Court of the District of Columbia; neither is con-clusive upon the parties until confirmed by that court; and both are subject to revision in matter of law by the Court of Appeals. The instructions given at the trial upon the proper elements of benefits in either stage or aspect of the case have not been, and could not be, brought before this court for re-vision — the jurisdiction of this court being limited by section 17 of the act of 1893, as amended by the act of January 21, 1896, c. 5, to the determination of the question whether the act of 1893, or any part thereof, is unconstitutional.

All the parties to these proceedings had due notice of the assessment of benefits under section 15, as well as of the assess-ment of damages under the earlier sections, by the publication of notice, in accordance with section 8, warning them to attend the court, " and to continue in attendance until the court shall have made a final order in the premises." If the lands of any other persons should be sought to be assessed for benefits under section 15, notice would be required to them by the provision thereof that " the proceedings of the court and the

jury, in making assessments for benefits under this section, shall conform as nearly as is practicable to the foregoing provisions of this act relating to the assessment of damages."

The objection that the owners of lands assessed for benefits under these proceedings will be left liable to be assessed anew under future proceedings for establishing other highways in other subdivisions is without force. Whenever it has been provided by a general law that a part of the expense of establishing any highway shall be assessed upon all lands in the neighborhood benefited thereby, it may often happen that the same land may be benefited by each of two highways laid out at successive periods of time, and be liable to be assessed accordingly. Take a simple example by way of illustration: Suppose a highway is laid out from north to south, increasing the value of the lands through which it runs and of all other lands in the neighborhood, and assessments of a portion of the cost are made upon all such lands and collected; and another highway is subsequently laid out from east to west, crossing the first highway at right angles; it may well happen that thereby the same, or some of the same, parcels of land benefited by the first highway, may be further increased in value, in common with other lands in the neighborhood, by the laying out of the second highway; and, to the extent to which they are so increased in value, they may justly and lawfully be subjected to a new assessment. The like result may take place when a highway, established at first through one subdivision only, is afterwards extended through another subdivision.

Objection was made to that part of section 15, which provides that the assessment, when confirmed by the court, shall be a lien upon the land and be collected like other taxes, and " be payable in five equal annual instalments, with interest at the rate of four per centum per annum from the date of the confirmation of the assessment by the court." But it is within the commonly exercised and indisputable power of the legislature to make taxes of any kind, assessed upon real estate, payable forthwith, and an immediate lien thereon. In the leading case of *Davidson* v. *New Orleans,* the objection that the assess-

ment was actually made before, instead of after, the work was done, was held to be untenable; and Mr. Justice Miller, speaking for this court, said : " As a question of wisdom — of judicious economy — it would seem better in this, as in other works which require the expenditure of large sums of money, to secure the means of payment before becoming involved in the enterprise." 96 U. S. 100.

In coming to the conclusion that both section 11 and section 15 are in all respects constitutional, we do not find it necessary to invoke the familiar rule of construction, well expressed in Chief Justice Alvey's opinion in the present case as follows : " Every reasonable intendment should be indulged in order to maintain the act in its entirety, and if there be any reasonable mode of construction by which the entire act, and every provision thereof, may be sustained, as against a mere plausible construction tending to a contrary result, the former mode of construction must prevail. It is only when no other reasonable construction can be supported, that an act of Congress, or any part of it, can be declared to be unconstitutional and void, or invalid for any cause." 8 App. D. C. 421, 422.

The objections taken in argument to the constitutionality of other parts of the act may be more briefly disposed of.

The recording of the map under section 2 does not constitute a taking of any land, nor in any way interfere with the owner's use and enjoyment thereof. The provision of that section that after the map has been recorded, no further sub-division, not in conformity with the map, shall be admitted to record, goes no farther than the earlier acts of Congress of January 12, 1809, c. 8, and August 27, 1888, c. 916, cited at the beginning of this opinion ; and is clearly within the authority of Congress to prevent anything being placed upon the public records, which may tend to defeat its object of securing uniformity in the entire system of highways in the District. The provision of section 3, giving to any deed or will, duly recorded, which refers to the subdivision made by the map, the same effect as if such subdivision had been made and recorded by the grantor or testator, tends to promote the same object, and

benefits rather than injures owners of lands. The provision of section 2, forbidding the Commissioners of the District of Columbia and all other public officers or agents to accept, improve, repair, or assume any responsibility in regard to highways not in conformity with the map, does not touch the rights of owners of lands; but was evidently intended to prevent the District of Columbia from being held responsible to travellers upon such highways, under the law prevailing in the District, as declared by this court, and suffered to remain unchanged by Congress. *Barnes* v. *District of Columbia,* 91 U. S. 540; *Detroit* v. *Osborne,* 135 U. S. 492, 498; *District of Columbia* v. *Woodbury,* 136 U. S. 450, 457. The object of the recording of the map is to give notice to all persons of the system of highways proposed to be established by subsequent proceedings of condemnation. It does not restrict in any way the use or improvement of lands by their owners before the commencement of proceedings for condemnation of lands for such highways; nor does it limit the damages to be awarded in such proceedings. The recording of the map, therefore, did not of itself entitle the owners of lands to any compensation or damages. *Shoemaker* v. *United States,* 147 U. S. 282, 321; *Prosser* v. *Northern Pacific Railroad,* 152 U. S. 59; *In re Pittsburgh District,* 2 W. & S. 320; *In re Forbes Street,* 70 Penn. St. 125; *In re Furman Street,* 17 Wend. 649; *Forster* v. *Scott,* 136 N. Y. 577; *Steuart* v. *Baltimore,* 7 Maryland, 500, 516.

The act throughout clearly manifests the intention of Congress that, especially with regard to the highways in existing subdivisions, all the proceedings, from the preparation of a general plan by the Commissioners of the District of Columbia to the award and payment of damages for lands taken or injured, the assessment of the amount of those damages upon lands benefited, the taking possession of the land condemned, and the actual construction of the highways, shall go on without unnecessary delay. By section 2, the Commissioners are directed to make the plan in sections, beginning with areas covered by existing subdivisions, and, as soon as the map of any section has been approved, to record it; and, in

order to enable them "to proceed speedily and efficiently to carry out the purposes of this act," are authorized to employ assistant engineers to have immediate charge of the work; and by section 4 the Commissioners and their agents are authorized to enter upon lands to make surveys. By section 6, within thirty days after a map has been recorded which changes highways in an existing subdivision, the Commissioners are to present to the court a petition for the condemnation of a permanent right of way, over all lands included within the highways laid out upon the map. By section 10, the damages to all the parcels of lands involved in the proceedings may be estimated by one jury; and by section 15 the same jury may be entrusted with the assessment of those damages upon lands benefited. By section 16, when damages have been assessed, the court is to order payment thereof to the parties or into its registry, and a copy of the order is to be presented to the Treasurer of the United States, to be reported by him to Congress. And by section 18, as soon as the damages have been assessed and paid, the Commissioners are to take immediate possession of the land; but if Congress, during six months of its session, omits to make the necessary appropriation, the proceedings are to be void, and the lands to belong to the owners.

Under the Constitution, and by the express provision of section 18 of this act, the United States are not entitled to possession of the land until the damages have been assessed and actually paid. The payment of the damages to the owner of the land and the vesting of the title in the United States are to be contemporaneous. The Constitution does not require the damages to be actually paid at any earlier time; nor is the owner of the land entitled to interest pending the proceedings. *Shoemaker* v. *United States*, above cited; *Sweet* v. *Rechel*, 159 U. S. 380.

The last clause of section 18, which provides that if the court enters judgment of condemnation in any case, and appropriation for the payment of the award of damages is not made by Congress, after being six months in session, "the proceedings shall be void and the land shall revert to the

owners," clearly means, by the words "the proceedings," all the proceedings, not merely the award of damages, but also the assessment of benefits, for if the award of damages is void, there remains no sum to be assessed for benefits. The phrase "and the land shall revert to the owners," is not happily chosen, for, the damages not having been paid, the title in the land has never passed out of them; but the clear meaning is that the title to the land shall be held to have remained in the owners as if no proceedings for condemnation had been had. This provision secures the owners from being compelled to part with their lands without receiving just compensation, and is within the constitutional authority of the legislature. *Baltimore & Susquehanna Railroad* v. *Nesbit*, 10 How. 395; *Garrison* v. *New York*, 21 Wall. 196.

The result is that there is nothing in the act of March 2, 1893, c. 197, inconsistent with the Constitution, and therefore the judgments of both of the courts of the District of Columbia must be reversed. So far as the cases are disclosed by the records sent up, it would seem that judgment should be entered upon each of the verdicts as originally returned. But the appellate jurisdiction conferred upon this court being restricted to the determination of the question whether the act of 1893, or any part thereof, is unconstitutional, the safer and more proper form of judgment appears to this court to be

*Judgments of the Court of Appeals and of the Supreme Court of the District of Columbia reversed, and cases remanded for further proceedings not inconsistent with this opinion.*