Madden, Judge,
delivered the opinion of the court:
The plaintiff operated several liners on scheduled sailings from Seattle to Manila by way of ports in Japan and China. In August 1937, the Department of State, to meet an emergency which had arisen at Shanghai, directed the plaintiff to cause its ship, S. S. President Jefferson, which was then off Shanghai on its return journey from Manila, to embark to capacity American women and children at Shang *388 hai arad take them to Manila. The plaintiff was directed to collect fares from all passengers except certain destitute ones whose fares would be paid from emergency funds controlled by the Consul General.
The plaintiff obeyed the direction and after discharging the passengers at Manila, resumed her homeward voyage, but omitted her scheduled calls at China ports. She arrived at Kobe, Japan, August 26, 1987, seven days behind schedule. She speeded up her normal 12 day journey from Yokohama to Victoria, B. C., and made it in eleven days, using $559.39 worth of fuel oil more than would have been required for the usual run. She arrived in Seattle six days behind schedule, but, by working longshoremen overtime at unloading and loading, at a cost of $3,132.52 more than normal, she was ready to sail on her next journey September 12, only one day behind schedule. Because of a strike of her seamen, she did not actually sail until four days later.
The plaintiff filed a claim with the Department of State for compensation for the ordered diversion. This claim included a charge of $2,414.60 per day, the average amount of the plaintiff’s normal revenue for seven days, but deducting from the product the fares collected from the passengers from Shanghai to Manila; a charge for the eastbound revenue which the plaintiff had had booked at Shanghai which had been canceled and not rebooked; a charge which apparently was for the higher price which the plaintiff had to pay for the fuel oil at Manila; and certain charges for extra crew service and insurance. These charges the Department allowed and paid.
The plaintiff’s claim also included other charges arising out of the fact that its ship had been thrown off schedule by the diversion. Some of these related to the next succeeding voyage out of Seattle, and are not pressed in this suit. The ones which are here pressed, and were disallowed by the Department are $1,224.00 for additional fuel consumed in making up time, and $5,109.74 for extra long-shore overtime at Seattle. "We have found that the amounts actually spent for these two items were $559.39 and $3,132.52, respectively. We now reach the question whether the plaintiff may recover the amount of these expenditures.
*389 Wben the Government took the plaintiff’s facilities to meet the Shanghai emergency, it was under a duty, under the Fifth Amendment to the Constitution, to give the plaintiff just compensation. The act appropriating funds to the Department of State to meet unforeseen emergencies in its foreign service, 50 Stat. 770, the money to be expended in accordance with the provisions of 31 U. S. C. 107, would seem to have provided money for that purpose. When the plaintiff’s ship was diverted, the threatened disruption of its schedule and the losses which would follow that disruption, were evident, and should have been to whatever extent they occurred considered in computing compensation.
It was prudent for the plaintiff, its ship having been put behind schedule, to take reasonable measures to restore it to schedule. The expenditures for extra oil to shorten the return journey by a day, and for extra overtime for longshoremen at Seattle to shorten the period of unloading and loading, were reasonable, and probably had the effect of mitigating the losses caused by the diversion.
Though the taking of the plaintiff’s ship for a public use required compensation, under the Fifth Amendment, and in the circumstances, probably created a promise implied in fact on the part of the Government to make compensation, nothing in the circumstances is of any assistance to us in determining how that compensation should be measured. We must, therefore, rely upon the general doctrine that just compensation must be measured by the loss occasioned to the owner by the taking. Bauman v. Ross, 167 U. S. 548, 574.
The evidence does not show what the plaintiff’s loss was. It submitted a bill to the Department of State which, as we have said, listed many items. Some of those were allowed and the ones here in suit were not. We do not, however, regard the Department’s treatment of the items allowed as a final disposition of those items which eliminates them from consideration in this suit which the plaintiff has brought because of its unwillingness to accept the settlement offered by the Department. We therefore regard the whole transaction, including the payments already made, as *390 relevant in determining whether further payments are necessary to give the plaintiff just compensation.
The plaintiff was paid, by the Government and by the passengers placed upon its boat at Shanghai by the Government, $2,416.40 a day for seven days, a total of $16,902.20. It was paid all the expenses in excess of normal incurred by it during the diversion. Tt was paid $6,866.75 for lost e'astbound revenue booked at Shanghai and canceled, apparently because its boat omitted the Shanghai stop on its eastbound voyage, sailing instead directly from Manila to Japan.
The evidence is silent as to whether, after the President Jefferson had completed its errand for the Government and resumed its usual route, seven days behind schedule, it had all of the passengers and freight that it would have had if it had been on time, or more, or less, and if less, how much less. The only lost revenue that the evidence adverts to was that booked at Shanghai, and the Government paid for that, so that the plaintiff got the revenue without carrying the goods or passengers.
If the plaintiff’s eastbound revenue was substantially normal, it had had a profitable diversion which had earned it an extra $16,902.20, including the payments already made by the Government, and the only loss which faced it was the loss incident to the disruption of its schedule. It averted that loss, except for one day, by its hurried trip across the Pacific at an extra cost of $559.39 for fuel oil and by its hurried turnaround at Seattle at an extra cost of $3,132.52 for longshoremen’s overtime. In this condition of the admitted evidence, we are not informed whether the plaintiff made a profit from the Government’s diversion of its ship, considering the payments already made by the Government, or suffered a loss. It would have been easy for the plaintiff to prove what its eastbound revenue was, and how it compared with its normal revenue. In the circumstances we have no reason to speculate as to whether there was a loss, and will dismiss the petition.
The Government offered in evidence itemized statements prepared by the plaintiff and submitted by it to the State Department in connection with its claim. These statements *391 were analyses of earnings and expenses of the President Jefferson on several voyages, including voyage 67, the one here in question, and voyages 65 and 66, the two preceding voyages. The plaintiff objected to their admission on the ground that “they are wholly immaterial to the issue here involved, for the reason that the testimony here shows and the petition alleges that the items which they were prepared to support have been heretofore paid by the Government and there is no dispute on those items at all, there being only a dispute as to two items with which these documents are in no way connected.” Upon the plaintiff’s objection, the analyses were excluded, and are not in evidence. It is now suggested that they be considered as in evidence for the purpose of showing that the plaintiff had a net operating loss on voyage 67 and is therefore entitled to more compensation than it has received.
We think their use to support the plaintiff’s case after the plaintiff had caused them to be excluded, would be improper. If they had been admitted, they would, like any statement of accounts prepared by a party to a suit, have been the subject of analysis and of examination of the party which prepared them. The most casual study of them would have disclosed that the plaintiff’s passenger revenues on voyages 65, 66, and 67 were, respectively, $51,629.92, $45,114.41, and $92,054.05, including, in voyage 67, the payments already made by the Government for the per diem use of the ship and for revenue lost at Shanghai. As to passenger revenue then, the plaintiff’s receipts for the voyage in question were more than $40,000 in excess of and were nearly double the best of its two preceding voyages. As to freight, the receipts were, for the three voyages, $89,663, $74,205.26, and $96,102.44 respectively, so that the freight receipts were more than $6,000 in excess of the best of the two preceding voyages. The asserted operating loss resulted to a considerable extent from lower mail receipts, which were $42,662.81, $42,641.75, and $4,733.56 on the three voyages. It is fair to assume that the loss of mail receipts was not due in any degree to the fact that the vessel was diverted by the Government and put behind schedule, since the plaintiff does not even suggest any such fact. Another item contributing to the operating loss *392 asserted on the plaintiff’s statement to the State Department was the large item for repairs charged to voyage 67. The repairs charged to voyages 65, 66, and 67 were $14,335.95, $6,552.97, and $23,473.79, respectively. But the engineer’s log, which is in evidence, shows that the ship was in drydock for three days at the beginning of voyage 67, and not at all at the end of the voyage. The repairs made in drydock, which must have been major, were made weeks before the Government diverted the ship, and were in no sense a consequence of the diversion.
Even a casual examination, then, of papers not in evidence because the plaintiff succeeded in having them excluded, seems to show that the plaintiff, far from suffering a loss as a result of the Government’s diversion of its ship, was benefited to the extent of several tens of thousands of dollars. If there is any burden at all on a claimant from the public funds to prove a loss in order to obtain a judgment, this plaintiff has not sustained that burden.
The plaintiff may not recover. It is so ordered.
Littleton, Judge; and Whaley, Chief Justice, concur.