**IRIARTE et al. v. UNITED STATES.**

**UNITED STATES v. IRIARTE et al.**

Nos. 4113, 4114.

Circuit Court of Appeals, First Circuit.

Aug. 14, 1946.

Williams and Roger P. Marquis, both of Washington, D.C., and Philip F. Herrick, U.S. Atty., of San Juan, P. R., on the brief), for the United States.

Celestino Iriarte, Jr., of San Juan, P. R., Jose A. Poventud, of Poncè, P. R., and Hector Gonzalez Blanes, of San Juan, P. R., for Celestino Iriarte, Jr., and others.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

These are cross-appeals from a judgment of the District Court of the United States for Puerto Rico awarding $33,297 as just compensation for 33.297 acres, more or less, of land fronting on Pueblo Viejo Bay in San Juan Harbor condemned and taken by the United States Government for purposes admittedly of a military nature.

The United States filed its Declaration of Taking and its Petition for condemnation in the court below on May 31, 1941. In the Declaration the then Secretary of War alleged that the taking was under various acts of Congress, including that of August 1, 1888, 25 Stat. 357, 40 U.S.C.A. § 257 et seq., that of August 18, 1890, 26 Stat. 316, as amended by the Acts of July 2, 1917, 40 Stat. 241 and April 11, 1918, 40 Stat. 518, 50 U.S.C.A. § 171, and that of February 26, 1931, 46 Stat. 1421, 40 U.S.C.A. § 258a, and acts supplementary thereto and amendatory thereof; that the full fee simple title to the lands and all the buildings and improvements thereon and appurtenances thereto was being taken; and that $7,311.60 as the estimated just compensation therefor was simultaneously deposited in the registry of the court for the use and benefit of the persons entitled thereto. In this Declaration the Secretary of War set out that "The public uses for which said lands are taken are as follows: The said lands are necessary to adequately provide for storage and terminal facilities at an army base. The said lands have been selected by me for acquisition by the United States for use in connection with the establishment of a terminal and dock to serve the Puerto Rican General Depot, and for such other uses as may be authorized by

George S. Swarth, Atty., Department of Justice, of Washington, D. C. (J. Edward

Congress or by Executive Order, and are required for immediate use."

The Petition for Condemnation recites the same statutory authority for the taking and that: "The Secretary of War, acting under the authority vested in him by the acts herein above stated, has determined that, in his opinion, it is necessary and advantageous to acquire [the lands involved] for the United States by condemnation under judicial process * * * for the purposes of the acts above set forth, to be used for military purposes."

On the day the Declaration and Petition were filed the court below on the petitioner's motion entered a judgment vesting title to the lands in fee simple in the United States, and also giving it the right to possession immediately upon the service of a copy of the Judgment, Petition and Summons upon the defendants in possession of the premises. Thereafter the defendants below answered alleging that they were the sole owners in fee simple absolute of the lands involved, and that the amount deposited as just compensation was wholly inadequate—the fair market value of the land being in fact not less than $200,430. The United States admitted the defendants' title, and at the trial in the District Court the sole issue litigated was the value of the land, the principal bone of contention being the most valuable use to which it could readily be devoted—the defendants contending that it was eminently suitable for development as industrial water-front property in the way the United States in fact developed it; the United States taking the position that such development was so expensive that only it or the Insular Government could undertake such a project and that in private hands the best use for the land was to subdivide it and sell it in small lots for the erection of low-cost houses.

We shall consider the defendants' points of appeal first.

█ The defendants now for the first time question the statutory authority of the Secretary of War to take their lands in the name of the United States for the purpose disclosed in the Declaration of Taking. They do not question the taking on the ground that their lands are not to be put to a public use of a military nature. Nor do they question the Secretary's administrative determination of the necessity for taking their lands for that use. Their contention boils down to the specific proposition that although the act of August 18, 1890, as amended by the acts of July 2, 1917, and April 11, 1918, supra, 50 U.S.C.A. § 171, authorizes the acquisition of "any land, temporary use thereof or other interest therein, or right pertaining thereto, needed for the site, location, construction, or prosecution of works for fortifications, coast defenses, military training camps" etc., it does not authorize the acquisition of lands "for use in connection with the establishment of a terminal and dock to serve the Puerto Rican General Depot." We cannot subscribe to this contention. In fact we regard it as so lacking in merit that we do not pause to consider possible impediments to our considering it due to the failure of the defendants to raise it below.

Construed as the defendants would have it the statutory language quoted above would authorize the taking of lands by the United States for use as the actual sites of fortifications, coast defences or military training camps, but would not authorize the taking of lands by the United States to provide access to such military installations or even, possibly, to provide the lands needed for storage of the ammunition and other supplies and equipment essential to make such installations effective. It is hard to believe that Congress intended any such extraordinary result to follow from the language it used. On the contrary it seems to us abundantly clear that by providing that lands may be taken not only for the site, but also for the "prosecution of" the military installations enumerated, Congress must have intended to authorize the taking of whatever lands the Secretary of War might validly determine to be necessary for use in connection with land devoted directly and immediately to fortifications, coast defenses or military training camps. Thus we have no difficulty in reaching the conclusion that the statute authorizes the taking of land for the uses and purposes disclosed in the Declaration of Taking and Petition for Condemnation. See City of Oakland v. United States, 9 Cir., 124 F.2d

959, 964, certiorari denied 316 U.S. 679, 62 S.Ct. 1106, 86 L.Ed. 1753.

The former owners of the land involved herein concluded their answer in the court below with a demand for "trial by jury as provided by acts of Congress," and at the outset of the trial they argued their right thereto at length in the District Court. That court, however, refused their request on the ground that § 2 of the act of August 1, 1888, supra, now 40 U.S.C.A. § 258, required conformity as near as may be with local practice and procedure, and local practice and procedure in Puerto Rico did not require or even permit, trial by jury on the issue of value, or any other issue, in condemnation cases. We think this ruling correct.

■■■ The defendants did not suggest in the court below, nor do they suggest here, that trial by jury in condemnation cases is or ever was a feature of insular law. Instead they contended below that they were entitled to a jury trial by the Seventh Amendment. Now, however, they have abandoned that claim, apparently either in recognition of the rule that "By the constitution of the United States, the estimate of the just compensation for property taken for the public use, under the right of eminent domain, is not required to be made by a jury," (Bauman v. Ross, 167 U.S. 548, 593, 17 S.Ct. 966, 983, 42 L.Ed. 270, and cases cited) or possibly because of the statement in Balzac v. Puerto Rico, 258 U.S. 298, 304, 305, 42 S.Ct. 343, 66 L.Ed. 627, that the constitutional provisions for trial by jury in criminal and civil cases do not apply to territory belonging to but not incorporated into the Union, and rest their contention solely upon 28 U.S.C.A. § 770, which provides, so far as material, that "The trial of issues of fact in the district courts, in all causes except cases in equity and cases of admiralty and maritime jurisdiction, and except as otherwise provided in proceeding in bankruptcy, shall be by jury."

Thus, there being no constitutional question presented, and it being conceded that the law of Puerto Rico does not provide for trial by jury in condemnation cases, the problem before us is to reconcile the provisions of § 2 of the act of August 1, 1888, 40 U.S.C.A. § 258, requiring conformity as near as may be with local forms of trial in cases like this, with the provisions of 28 U.S.C.A. § 770 requiring trial of issues of fact in District Courts by a jury except in cases in equity, in admiralty, and in certain instances in bankruptcy.

■■■ Two rules of statutory construction point unmistakably to the conclusion that the provisions of § 2 of the act of 1888 control. In the first place the provision for trial by jury contained in 28 U.S.C.A. § 770, stems directly from § 9 of the Judiciary Act of 1789, 1 Stat. 73, 77, and thus antedates the conformity provision of the act of 1888 by very nearly a century, so that the rule applies that a later expression of the legislative will supersedes a former conflicting expression thereof. Beatty v. United States, 4 Cir., 203 F. 620, 621, 622. Then in the second place the statutory requirement of trial by jury is general, whereas the statutory requirement of conformity is specific, so that the rule applies that when there are two conflicting statutes upon the same subject, one general and the other specific, the specific statute governs without regard to priority of enactment. United States v. Hess, 8 Cir., 71 F.2d 78, 79, and cases cited.

■■■ Next the defendants contend that the District Court's valuation of their lands is "plainly against the proof and, at least, contrary to the clear weight of the evidence," and is so manifestly inadequate that we ought to set it aside. In answer to this contention it is only necessary first to point out that the Rules of Civil Procedure, 28 U.S.C.A. following section 723c are applicable to appeals in condemnation proceedings, Rule 81(a) (7) and that Rule 52 (a) in so far as it makes findings of fact conclusive is a rule of appellate procedure (United States v. Lambert, 2 Cir., 146 F.2d 469, 471), so that we cannot set aside an award of compensation in cases of this sort unless it is shown to our satisfaction that the trial court's appraisal of value is "clearly erroneous" (United States v. Delano Park Homes, Inc., 2 Cir., 146 F.2d 473, 475), and then to say that no such showing can here be made because the evidence of

value in this case is highly conflicting, as we shall have occasion to demonstrate more fully hereafter, and the compensation awarded is well within the range of the testimony of the qualified expert witnesses called by the parties.

The defendants' last contention is that the court below erred in failing to take the natural adaptability of their land for industrial purposes into consideration in fixing its fair market value, and then in not finding that its fair market for that purpose, even without improvements, exceeded $200,000. It will suffice to say in refutation of the first part of this contention that statements made by the court below, both during the trial and in the portion of its memorandum opinion quoted hereinafter, clearly indicate that it carefully considered the most valuable use to which defendants' lands might be readily converted (United States ex rel. T. V. A. v. Powelson, 319 U. S. 266, 275, 63 S.Ct. 1047, 87 L.Ed. 1390) and in refutation of the second part to say that the testimony with respect to their value for that purpose varies so greatly and is so highly conflicting that the same principle applies to this part of the defendants' present contention that applies to their former one.

This brings us to the point made by the United States in support of its cross-appeal and the real nub of the case.

The defendants' lands, as has been stated, fronted on Pueblo Viejo Bay in San Juan Harbor. It appears that at the time of the taking they were for the most part uninhabited and unimproved, that a substantial proportion of them were low-lying and swampy, and that the bay upon which they fronted was only a few feet deep. Furthermore, it appears that some six or seven thousand feet of channel and a turning basin in front of the land would have to be dredged in order to give ocean-going ships access to it and thus make it available for development as industrial water-front property. Nevertheless the defendants contend that this was the most valuable use to which their lands, even in private hands, could be put in 1941. They say that the need for additional docking facilities in San Juan Harbor was then so great that it was not only economically feasible but commercially advantageous to dredge the channel and turning basin required to make their lands suitable for development as industrial water-front property, using the material dredged out of the bay to fill the swampy portions of the land, and to substantiate this they point out that the United States took the lands and developed them in the way indicated for this very purpose.

The United States, on the other hand, contends that the shortage of docking facilities in San Juan Harbor in 1941 was caused solely by the war emergency then existing and so was only temporary, and that the expense of developing the defendants' lands to remedy that temporary condition was so great that it would be uneconomical to do so at private expense, but that it was justified as a military measure in time of impending war. These conflicting contentions go far to explain the wide discrepancy in the testimony as to value given by the opposing expert witnesses.

Confronted with this situation the court below thought it expedient to file a memorandum opinion in which, after noting the wide variance in the testimony, but finding the expert witnesses for both parties about equally qualified, it said that it was unable to accept the conclusion of either group. Then, after discussing the testimony of some of the witnesses in detail it concluded its opinion with the statement:

"All the witnesses for petitioner knew that this condemnation was for the purpose of building a dock or pier. They did not, however, give any consideration to the site for such purpose because as stated by them, they regarded the cost of necessary dredging to be prohibitive if undertaken by a person other than the Government. It occurred to me at the time that none of the witnesses gave consideration to a well known policy of the United States with reference to dredging in navigable water if and when commercial needs require additional facilities in any particular locality. Any one who takes time to examine legislation of the United States Congress would find that each year appropriations are made from the general funds of the Treasury for dredging rivers and harbors. This

is done at no cost to property owners. The testimony of Mr. Canejas[1] will not sustain the valuation given to this property if it be considered only for urbanization purposes. These, in brief, are the reasons which caused me to reach the conclusions stated."

From this quotation it is apparent that the court below in valuing the defendants' lands at $33,297 did not accept the government's evidence that the most valuable use to which it could readily be put was for a low cost housing development. And it is equally apparent that it did not believe the former land owners' evidence that it was economically expedient in 1941 for private enterprise to do the dredging necessary for its development as industrial water-front property. Instead it seems evident that the court below took a middle course and valued the defendants' land for commercial water-front purposes but with reference to the well known policy of the United States Government to dredge navigable rivers and harbors without cost to riparian landowners directly benefited thereby if and when there was an apparent commercial need therefor. This the government contends constituted error for two reasons: first, because the record gives no support for any assumption that the defendants' land would ever in the future be benefited by the federal policy of free development of navigable water ways, and second for the more fundamental reason that in any event the possibility, even the immediate possibility of benefit from that policy ought not to be considered as an element in determining the amount of compensation which the United States must pay upon condemnation of the property. We agree with the government's contention for the first reason stated therefor, but not for the second.

The Supreme Court of the United States has said many times that the "just compensation" which the Fifth Amendment to the Constitution requires the government to pay for private property taken by it for the public use is its "fair market value" at the time of the taking,—the price in cash at which the property would at that time change hands in a transaction between a willing buyer and a willing seller, neither acting under any compulsion to buy or to sell. United States v. Miller, 317 U.S. 369, 373, 374, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, and cases cited. See also United States v. General Motors Corp., 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311, 156 A.L.R. 390. The government concedes that this is the rule. But it contends that there are exceptions to it which clearly indicate that it was error for the court below in valuing the land to give any consideration whatever to the possibility, either immediate or remote, that the United States might in the future dredge a channel to it without cost to the owners. It says that the cases of United States v. Chandler-Dunbar Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063; United States v. Miller, 317 U.S. 369, 63 S. Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, and United States ex rel. T. V. A. v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390, support this contention because they establish the proposition that while the government must pay the "fair market value" of the lands it takes for the public use, it does not have to compensate for any increments to the value thereof of its own creation and that the case at bar falls within this principle. We cannot agree.

In the Chandler-Dunbar case supra, it was held that an owner of land on a navigable stream was not entitled to compensation for the value accruing to his land because of the fact that it might be used as the site for a dam or for locks and canals, for the reason that it could be used for such purposes only by leave of the federal government, and compensation for that increment of value, therefore, was compensation not for the land but for the possession of a revocable privilege granted by the government to use it for a particular purpose. United States v. Powelson, supra, is to the same effect since in that case it was held that separate tracts taken by condemnation ought not to be valued as parts of a unit

---

[1] Mr. Canejas testifying as an expert witness for the government said that the land was most valuable for a low cost housing development and placed a value upon it for that purpose substantially below the award of compensation made by the District Court.

which could arise only upon the acquisition in the future of other intervening tracts not yet acquired by the owner, although that was their most valuable use, because the unit could be created only by the exercise by the owner of the revocable privilege to use the state's power of eminent domain. Obviously neither of these cases is in point.

The Miller case, supra, differs somewhat from those just mentioned. In it the Supreme Court was confronted with the problem of valuing land located from the beginning within the probable scope of a governmental project, but not included in the original taking, which in the interval between the time when it was taken and the original taking had increased in value because of the proximity of the project. It held that this element of increased value was not one for which the United States was required to pay compensation to the owner. But it clearly indicated that if the land had lain outside the probable scope of the original project, and had increased in value by reason of the project, compensation for this increased value would have to be paid. It said 317 U.S. 376, 63 S.Ct. 276, 281, 87 L.Ed. 336: "If a distinct tract is condemned, in whole or in part, other lands in the neighborhood may increase in market value due to the proximity of the public improvement erected on the land taken. Should the Government, at a later date determine to take these other lands, it must pay their market value as enhanced by this factor of proximity."

The Miller case, of course, is not directly in point because in it the court was concerned with an element of the value of land created by the presence in its neighborhood of a specific governmental project, not with an element of its value created by a general governmental policy. Nevertheless it seems to us clearly to follow from the above quotation that an increment added to the value of land by a governmental policy is not to be deducted from the fair market value of land condemned in order to arrive at the amount of the just com-

pensation which must be paid therefor. And this indication is supported by practical considerations. For instance it would obviously be impossible as a practical matter to deduct from the fair market value of agricultural land all elements of its value due to the Government's agricultural policy. Many other similar elements of value might be mentioned, even the element of value inhering in all property as a result of the Government's defense policy. However, we think enough has been said to warrant the conclusion that the criterion of fair market value is to be applied without subtraction from the result thereby obtained of any elements of value resulting from the general policies of the Government.

But before any governmental policy can be considered as affecting the market value of property, there must be evidence to indicate that the existence of that policy would be taken into consideration by the willing buyer and the willing seller whose bargain is the test of value. That is to say, to sustain the award made in the case at bar there must be evidence in the record that there was sufficient likelihood of federal aid in improving the harbor to influence the market price of the land for a dock site. We find no such evidence in the record before us. For all that appears the land would change hands only for private subdivision or for entirely private development into commercial waterfront property. There is no evidence that the prospect of federal aid was immediate enough to influence its value. Thus the court below erred in basing its award in part upon the Government's policy of free improvement of navigable rivers and harbors.

The defendants' motion to dismiss the Government's appeal has been considered but is found not to merit discussion.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.