UNITED STATES v. GRIGALAUS-
KAS et al.

No. 4613.

United States Court of Appeals
First Circuit.

April 4, 1952.

John J. Finn, Attorney, Department of Justice, Washington, D. C. (Holmes Baldridge, Asst. Atty. Gen., George F. Garrity, U. S. Atty., Boston, Mass., and M. M. Heuser and David B. Bliss, Attorneys, Department of Justice, Washington, D. C., on brief), for appellant.

Jules E. Angoff, Boston, Mass. (Henry A. Malkasian, Boston, Mass., on brief), for appellees.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This is an appeal taken by the United States from a judgment entered by the United States District Court for the District of Massachusetts on June 15, 1951 for the minor plaintiff, Elizabeth M. Grigalauskas, in the sum of $94,650.00 upon a complaint under the Federal Tort Claims Act. 28 U.S.C. § 1346(b).

The complaint was brought by Joseph George Grigalauskas, a Massachusetts resident, and by Elizabeth Mary Ann Grigalauskas, his minor daughter, who sued through him as her next friend.

The minor plaintiff seeks to recover the sum of $250,000 damages resulting from the alleged negligent injection by a United States Army doctor of concentrated Hartman-Ringer's Solution in the lower portion of her back. The father seeks $15,000 damages for medical expenses and loss of the infant's services during her minority.

The defendant's motion for a new trial was based on various grounds, including the very same point upon which this appeal is based, i. e., the claim that the amount awarded is "patently excessive". This motion was denied on June 29, 1951. The record does not convince us that the court abused its discretion in the denial of this motion. McCoy v. Cate, 1 Cir., 117 F.2d 194.

The mother of the infant, Edna Grigalauskas, was admitted to the Station Hospital at Fort Leavenworth, Kansas, by the authority of Army Regulations 40–505 and 40–590 on November 11, 1947 as the dependent of her husband, Joseph George Grigalauskas, an Army sergeant, then stationed at Fort Leavenworth. The minor plaintiff was born later on the day of admission. She was some two months premature and weighed three pounds and seven ounces. Five days after birth, on November 16, the nurse on duty discovered the infant was suffering from dyspnea, which is labored breathing, and subsequently from Cheyne-Stokes breathing, which is alternate periods of no breathing with short breaths in between. The attending Army doctor, who was Chief of Obstetrics and Gynecology, was called and on arrival, noticing the dehydration of the infant, decided that an injection of Hartman-Ringer's Solution was necessary to save the infant's life. The nurse then procured an ampule of this solution and the doctor administered ten cubic centimeters by a hypodermic needle to the lower portion of the infant's back about the spine before noticing the dark color of the solution. Only then did the doctor discover, by reading the label on the ampule, that the solution was in a concentrated form and that the solution should have been diluted by one part solution to twenty parts of sterile water prior to the injection.

Following the injection of the solution, the surrounding area of the injection, some 2½ to 3 centimeters in diameter, began to slough off and this area was treated alternately with wet penicillin packs and dried red blood cells. After the area had partially healed in from the sides, an op-

eration was performed on December 20 by which an attempt was made to suture the edges of the wound together. However, pycyaneous infection developed and the stitches came out. The infection was subsequently cured and the wound finally healed over.

The infant was discharged into the custody of her parents on January 15, 1948, and then, for the first time, the parents saw the extent of the infant's injuries.

Dr. William F. Cotting, an orthopedic surgeon, who examined the infant on December 31, 1949 for the first time, testified "that this child has a disfiguring, permanent, deforming scar, * * * with her increased physical growth * * * the deformity will tend to increase. This is explained by the fact that the scar tissue is inelastic. It has no elasticity, it will not stretch, and because it is adherent to the bony element beneath the skin and fixed, just anchored, she also shows a limitation of motion in the lower spine element, and that is permanent. That cannot be relieved by any surgery or set of exercises." He further testified that "She has a permanent loss of motion in the lumbar sacral joint" which was characterized as a permanent disability.

He also stated he thought she would be able to engage in ordinary female occupations but that for secretarial work she would have difficulty. "She would have pains and inability to sit for substantial periods. * * * She would have difficulty with work, standing, such as a waitress, or a sales clerk, or work as a stenographer or bookkeeper."

Dr. Malvin F. White, a plastic surgeon, who also examined the infant for the first time on December 31, 1949, and later on January 5, 1951, testified that the scar was nine inches in length, that the child stands with an awkwardness and walks with a mildly, somewhat waddling gait. It was his opinion that three or four operations over a period of about one year would be required and that the inelasticity of the scar would accentuate the deformity and interfere with normal growth and development, unless the scar is completely excised.

He also testified as to pain and suffering and the cost of the operations. Although he estimated she would get a 70 or 80 percent improvement by removing the scar and by doing "transmission", he stated she would always have a deformity and a scar. He based his opinion, as to the degree of improvement to be expected, on a series of successful operations. He testified that weakness of musculature would still be there after removal of the scar, that she should be under the care of an orthopedic doctor to follow up the plastic operations and that a spinal fusion, a major operation, might be necessary when she became an adult. He also thought she could dance and enjoy herself and would expect a good recovery but that she never would have as good a back as before.

Dr. Maxwell Macdonald, a neurologist, who also examined the infant on December 31, 1949, testified as to the child's low back muscle weakness and her mildly waddling gait. He was of the opinion that she would not be able to participate in various physical activities the same as other children who are completely free of injury. He knew of no way of getting any muscles back in that area and stated that: "First, may I say what I have seen on the child, the lower part of the spine. The muscles which support that have been destroyed, and there is the destruction of muscles around the buttocks. That essentially presents a weak, low back. Instead of the back being held in an erect position—you have to have the muscles to do it—that becomes what we term as lordosis, tipping forward, so the spine itself is thrown out of its normal erect posture.

"As the individual grows on in life, with the gravitational factors and increasing weight, she may get the discomforts of nerve pressure, and so forth. That is an outline of the hypothetical probabilities."

The only doctor who testified for the defendant was Dr. Robert E. Ingersoll, an orthopedist, who examined the infant on January 10, 1951. He was of the opinion that the scarring would not interfere with normal growth. He testified that he did not know whether or not muscles were de-

stroyed where the injection was made but felt they were normal. He did feel, however, that the scars were adherent to the fascia, the fibrous tissue covering of the various muscles of the body. He agreed that no operation could restore the dead tissues of this child.

The trial judge entered findings of fact and conclusions of law. He found that "the child has an extensive disfiguring and deforming scar running laterally across the lower area of the back. It extends out and parallel to the iliac crest on each side, the total length of the scar being 9 or 10 inches. From the lower end of the scar there is a linear scar extending to the anal margin. The tissues adjacent to it overhang in large folds creating an abnormal contour. She stands in 'fatigue' posture, with an increased curve in the lumbar region, flat chest and protruding abdomen. As she stands, the unyielding scar tissue which adheres to the fascia over the sacrum forms a cleft accentuated by protruding buttocks. The scar tissue is inelastic, and because it is adherent to the bony element beneath the skin—a permanent condition—she shows a limitation of motion in the lower spine element. She walks with a peculiar gait, 'waddles' while she runs, and accomplishes a range of 50 degrees only when bending and extending.

"The plaintiff child will require plastic surgery operations in the future, perhaps as many as four. Such operations will have desirable cosmetic effects, relieving the 'cleft' appearance in the lower back, but they will not restore mobility between the lower spine and the sacrum. She will always have considerable scarring. Her physical activity will be limited substantially. She will never be able to sit down comfortably. She will have difficulty in any activity which requires flexion of the lower back. She will not be able to participate in sustained physical sports. She will have great difficulty in child bearing. As she matures she will become more conscious of her deformity, and will have difficulty with psychological factors of adjustment."

The court also stated there was evidence that a "series of plastic surgery operations,

dressings, post-operative care and hospitalization will cost a minimum of $2,500, a maximum of $10,000. * * * The probabilities are that, conceding the success of the proposed surgery, her permanent disability will preclude her from employment. She will suffer pain as a result of the proposed operations and mental anguish while experiencing unavoidable psychological difficulties. * * *"

The government in its brief states that "* * * the infant may be considered to have had at the time of trial a life expectancy of 67 years. * * *"

The only question presented by the defendant in this appeal, as stated in its brief, is "Whether the finding of the court below that the infant appellee's damages amounted to $94,650 was so grossly excessive that it is 'clearly erroneous' and should, therefore, either be reversed and remanded for a new trial on the quantum of damages or, in the alternative be reduced by the imposition of a substantial remittitur."

The defendant also states in its brief that "With the exception of a permanent disability precluding employment the findings are in some measure supported by the evidence."

The defendant's chief contention appears to be that there is no evidence to support finding number 8 where the trial judge stated in part: "* * * The probabilities are that, conceding the success of the proposed surgery, her permanent disability will preclude her from employment. * * *" We do not agree with this contention. The portions of the testimony cited by us above, taken together with the whole record of the case, satisfies us that there is substantial and sufficient evidence to support this finding. In any event, after a review of the entire record we cannot say that this finding is "clearly erroneous".

Rule 52(a), F.R.C.P., 28 U.S.C. provides in part: "* * * Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. * * *" See Viejo v. United States, 1 Cir., 133 F.2d 84;

498

Iriarte v. United States, 1 Cir., 157 F.2d 105, 167 A.L.R. 494.

■ The defendant also complains that the trial judge failed to allocate the damages between the child and the father. The judge in the findings of fact and conclusions of law stated: "* * * It was stipulated that any amount recoverable by the father for consequential damages should be included in the award to the minor plaintiff. An appropriate verdict inclusive of any claim for consequential damages is $94,-650.00."

It appears that such a stipulation was not made between counsel, but that the plaintiff's attorney informed the court that an inclusion of any damages for the father could be made to the child. This matter was covered in the hearing before the trial judge on the defendant's motion for a new trial. An exact apportionment was not made but the judge in his finding number 7 said: "* * * the father had expended about $150 for doctors' fees. With respect to the future, there has been evidence that the series of plastic surgery operations, dressings, post-operative care and hospitalization will cost a minimum of $2,500, a maximum of $10,000."

The defendant at the hearing on the motion for a new trial made this statement: "* * * You have found some money for the soldier and awarded it to the child. I would like to know how much. I can't object to it unless I know what it is." To this the judge replied: "The only finding of consequential damage I think would be in the suggestion of $150."

There was testimony by the child's mother that $100 or $150 was paid to civilian doctors who examined the child. This relates to the father's cause of action. From the colloquy between counsel and the judge, especially at the hearing on defendant's motion for a new trial, we are satisfied that the court included the claim of the father in its judgment for the child. This is substantiated by the plaintiffs' attorney who stated in effect that any recovery of consequential damages by the father should go for the benefit of the child. It is difficult for us to see how the defendant is aggrieved by this result. It appears that the plaintiff father has waived any rights he may have and that he is foreclosed by the judgment as entered from claiming anything further from the government under this cause of action.

■■ It was not necessary in the instant case for the court to reveal the method in assessing unliquidated damages. See Ginsburg v. Royal Ins. Co., 5 Cir., 179 F. 2d 152. The damages awarded by the district court's judgment is not "monstrous", "outrageously excessive" or shocking to the conscience of the court from all the facts and circumstances disclosed in the record. Affolder v. N. Y., C. & St. L. R. Co., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. 683; United States v. Fotopulos, 9 Cir., 180 F.2d 631. We find no merit in any of the defendant's contentions.

The judgment of the district court is affirmed.