**UNITED STATES of America,
Plaintiff,**

**v.**

**85.11 ACRES OF LAND, MORE OR LESS, Situated IN PAWNEE COUNTY, OKLAHOMA, and W. L. Reed, also known as William Lowery Reed, and Audra Jean Reed, his wife, Douglas L. Reed, Jr., Patricia Reed, also known as Patricia Ann Reed, Jack Reed, Iva Reed, Jenareed Brinker Dailey, also known as Jenareed Brinker Daily, and Pat Dailey, her husband, et al., and Unknown Owners, Defendants.**

**Civ. No. 6046.**

United States District Court
N. D. Oklahoma.

July 16, 1965.

John M. Imel, U. S. Atty., Hubert A. Marlow, Robert P. Santee, Asst. U. S. Attys., Tulsa, Okl., for plaintiff.

Rucker, Tabor, Shepherd & Palmer, B. W. Tabor, C. D. Tomlins, Tulsa, Okl., for defendants.

BOHANON, District Judge.

This action in condemnation was instituted in the Northern District of Oklahoma by the United States of America as plaintiff, by Complaint filed September 11, 1964, against certain rights in the land described in the Complaint and the above-named defendants.

A brief history is necessary for an understanding of this case. The Congress, by an Act approved May 17, 1950, Public Law 516, 81st Congress, 2nd Session, 64 Stat. 163, and at page 174, authorized the construction of the Keystone Dam Reservoir on the Arkansas River in Oklahoma. After the passage of this Act, necessary steps and procedures were taken for the acquisition of the necessary lands and easements for the construction of this project. It is undisputed that the lands in question were within the scope of the project from the time the Government was committed to it by the above Act of Congress.

At the time and on the date of the conveyances from the defendants to the United States, it was well known to all of the parties to such conveyances covering the four separate tracts involved, as shown by map attached to plaintiff's Complaint, that the Keystone Project authorized by Congress by the law above referred to would be constructed, and the parties contracted by these conveyances in contemplation of the construction of the Keystone Dam and Reservoir, well knowing the general water level of the lake. It was also well known to the parties by maps of the Corps of Engineers where the water level would ordinarily be.

The Secretary of the Army, as provided by 33 U.S.C.A. § 591, was authorized to institute proceedings for land, and other interests needed for the prosecution of the works for improvement of rivers and harbors. This section of the law also provided that by agreement between the interest owners and the Secretary, he was authorized to purchase such land or interest for a price which seemed reasonable to him without further delay, or to proceed, if unable to agree with the owner, by way of condemnation.

The owners and the Secretary of the Army, by its duly authorized representative or delegate, entered into an agreement for the purchase and sale of the land and interests involved in this action. The United States of America, upon its printed form of conveyances, and prepared by it, procured from the defendants in this case each of the tracts herein involved. The instrument conveying Tract 3228 was by General Warranty Deed, and the interests in Tracts 3228E–3, 3228E–4, and 3228E–5, were obtained by what is commonly known and referred to as flowage easement deeds. In the granting clause, after a description of the land in each deed or conveyance, there was contained the following reservation, to-wit:

> "The vendors reserve the right to: construct, maintain, and operate thereon a commercial fishing and/or boat dock, together with the right of ingress and egress thereto."

All of the instruments were dated, signed, and acknowledged on the 24th day of June, 1961, and filed for record on June 30, 1961.

The reservations contained in the above-mentioned conveyances are the subject of this litigation. The plaintiff contends that the rights sought to be condemned have no value, and the defendants, on the contrary, contend and assert that these reserved rights have a definite and considerable value, and the taking thereof without just compensation is prohibited by the Fifth Amendment. As

heretofore stated, on September 11, 1964, plaintiff filed the present action, and seeks to take by condemnation proceedings each of the above-described reserved rights in the respective conveyances, and to each of the respective tracts, without compensation. Plaintiff does, however, state that it stands willing to pay any compensation that may be properly awarded. The plaintiff made no deposit with the Clerk of the Court as compensation for the interests sought to be taken as contemplated by 33 U.S.C.A. § 594.

Plaintiff, in its Brief in Support of Motion for Order for Delivery of Immediate Possession, states:

"The property to be acquired by this action is the reservation right which is set out above. This interest to be acquired is not considered to have a compensable value."

It is interesting to note that in the Brief last mentioned, the Government states:

"By oversight the option for Tract 3228, and all of the Deeds of conveyance, contained the following reservation:

'The vendors reserve the right to: construct, maintain, and operate thereon a commercial fishing and/ or boat dock, with the rights of ingress and egress thereto.'

"The rights purportedly reserved by this reservation conflict with the planned development of the public use areas of the Keystone Dam and Reservoir, which is currently nearing completion. *The City of Cleveland, Oklahoma, has applied for a fifty-year lease on the 142 acres of land for public park and recreational purposes, which included these tracts. The Government is in physical possession of the lands involved in this request, but it is considered necessary that the rights reserved in the deeds of conveyance be acquired.*" (Emphasis supplied.)

Plaintiff contends as stated in its Motion for Delivery of Possession that the language in the Deeds above re-cited was placed therein by oversight. There is no evidence to sustain this statement.

The position taken by the Government is to the effect that where lands were probably within the scope of the project from the time the Government was committed to it, the Government is not liable to pay any increase in value arising from the known fact that the lands probably would be condemned and the owners therefore ought not to gain by speculating on probable increase in value due to the Government's activities. Citing Shoemaker v. United States, 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392, and other cases, and relying to a large extent upon United States v. Miller, et al., 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L. R. 55. The cases relied upon by the plaintiff certainly are authoritative in stating the general rules with respect to condemnation, and particularly in view of the facts presented in each of the cases so cited and relied upon. This Court agrees with these cases and the rules announced therein. None of the cases cited by the plaintiff or by the defendant relate to a factual situation such as is here presented. This Court definitely agrees with the statement of law contained in the United States v. Miller case, 317 U.S., at page 377, 63 S.Ct., at page 281, wherein the Court said:

"* * * [T]he Government ought not to pay any increase in value arising from the known fact that the lands probably would be condemned. The owners ought not to gain by speculating on probable increase in value due to the Government's activities."

In Miller and other cases cited by the plaintiff, no question was presented respecting the rights of a grantor under deeds, by way of settlement other than by condemnation, reserving to the grantor certain rights in lands within the scope of the project to which the Government was committed.

**426**

Constitution, Amendment 5, provides: " * * * [N]or shall private property be taken for public use, without just compensation."

We are confronted in this case directly with the question of just compensation, if any, for the interest sought to be taken by the Government. A deed of conveyance is a contract between the parties. Gannett v. Cook, 245 Iowa 750, 61 N.W.2d 703; Shingleton v. State, 260 N.C. 451, 133 S.E.2d 183.

In Cunningham v. United States (C.A. 4), 270 F.2d 545, at page 550, the Court said:

"The general rule that government need not compensate a land owner for values it creates by establishment of the project which results in the taking is not to be carried to extremes. The Supreme Court has suggested that it is to be limited to the land in the probable scope of the original project and to values created by that project which occasions the taking. United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 [147 A.L.R. 55]. The court in Iriarte v. United States, 1 Cir., 157 F.2d 105, 167 A.L.R. 494, pointed out the wide effect of governmental policies upon the values of real estate. Beyond the limits indicated by the Miller case, those effects upon value cannot be eliminated in determining just compensation. The value of much waterfront property is dependent upon governmental maintenance of channels and harbor improvements. Where the burden of such maintenance has been undertaken by government, private transactions reflect the enhanced value of waterfront property. If government later condemns the property, just compensation should not be less than private purchasers would pay."

The Court of Appeals, Tenth Circuit, had under consideration in Bumpus v. United States, 325 F.2d 264, the rights of mineral interest holders or owners of a subsurface estate under a certain reservoir and the right of the owners of this reservation to the right to remove gravel so long as such removal did not in any way impair the operation of the reservoir. The Court decided that the removal of gravel was not of the same species as oil or gas and that the gravel moreover was exposed at the surface, therefore not within the reservation of the taking by the Government. It is significant to note, however, the language in this case, appearing at page 266 of the Opinion:

"Since the language of the reservation was written by representatives of the United States, it was incumbent upon the United States, since it chose to take less than the entire estate, to describe the estate to be taken with such exactness and certainty that the land owner would know what was reserved to him."

In United States of America v. Crance, et al. (C.A. 8), 341 F.2d 161, at pages 165–166, the Court said:

"The Fifth Amendment does not contain any standard of fairness for determining 'just compensation.' United States v. Cors, 337 U.S. 325, 69 S.Ct. 1086, 93 L.Ed. 1392 (1949). The so-called working rules of judicial expressions are nothing more than efforts by the judiciary for arriving at equitable awards under varying circumstances. The Supreme Court stated in Bauman v. Ross, 167 U.S. 548, 570, 17 S.Ct. 966, 975, 42 L.Ed. 270 (1897), 'Just compensation means a compensation that would be just in regard to the public, as well as in regard to the individual * * *.' In the later case of United States v. Commodities Trading Corp., 339 U.S. 121, 124, 70 S.Ct. 547, 94 L.Ed. 707 (1950), cited with approval in United States v. Virginia Electric & Power Co., 365 U.S. 624, 631, 81 S.Ct. 784, 789, 5 L.Ed.2d 838 (1961), the Supreme Court stated, 'The word "just" in the Fifth Amendment evokes ideas of "fairness" and "equity" * * *.'"

The conveyances involved in this case are contracts between the gran-

tors and the grantee, and the Government is bound upon its contract the same as a private citizen. A valid contract is property. North Texas Producers Association v. Young (C.A. 5), 308 F.2d 235, page 243, and cases cited.

The Government, like a private citizen, has no right to abrogate its contractual obligations. One of the leading cases is Lynch v. United States, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434, and we have found no case which reverses the Lynch decision insofar as the question of contract is involved, and the taking of property in violation of the Fifth Amendment. The Lynch case involved the right of Congress under the factual situation stated in the case to abrogate renewal provisions of term insurance to Veterans of World War I. At page 577 of 292 U.S., at page 842 of 54 S.Ct., the Court said:

"The benefits conferred by gratuities may be redistributed or withdrawn at any time in the discretion of Congress (citing cases). On the other hand, war risk policies, being contracts, are property and create vested rights. The terms of these contracts are to be found in part in the policy, in part in the statutes under which they are issued and the regulations promulgated thereunder."

Then at page 579 at page 843 of 54 S.Ct. the Court states:

"The Fifth Amendment commands that property be taken without making just compensation. Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States. Rights against the United States arising out of a contract with it are protected by the Fifth Amendment. United States v. Central Pacific R. Co., 118 U.S. 235, 238, 6 S.Ct. 1038, 30 L.Ed. 173; United States v. Northern Pacific Ry. Co., 256 U.S. 51, 64, 67, 41 S.Ct. 439, 65 L.Ed. 825. When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals. That the contracts of war risk insurance were valid when made is not questioned. As Congress had the power to authorize the Bureau of War Risk Insurance to issue them, the due process clause prohibits the United States from annulling them, unless, indeed, the action taken falls within the federal police power or some other paramount power."

The Court further said at page 580, at page 844 of 54 S.Ct:

"But Congress was without power to reduce expenditures by abrogating contractual obligations of the United States. To abrogate contracts, in the attempt to lessen government expenditure, would be not the practice of economy, but an act of repudiation. 'The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.' The Sinking Fund Cases, 99 U.S. 700, 719, 25 L.Ed. 496 [504]."

It is abundantly clear from the record in this case that when the deeds were taken from the defendants, granting to the United States of America certain lands and certain rights, the parties well knew and understood and took into consideration the fact that the Keystone Dam would be constructed and that the reservation contained in each deed of conveyance was a very material part of the consideration therefor and is so recited in each deed.

This Court cannot conscientiously condone the position taken by the Government in this case. The Government in effect says "Yes, the reservation was contained in each of the conveyances and was a part of the consideration therefor. But these reservations and these rights so reserved are meaningless and of no value."

■ This Court believes and so holds that the rights reserved by the defendants are valid contractual rights, based upon valid consideration, and were made by both parties in contemplation of the completion of the Keystone Reservoir and Dam, and should be given such value in this condemnation proceedings as the best available evidence warrants.

[8] The Complaint in this case was filed September 11, 1964. On application of the plaintiff, an Order was entered by the United States District Court dated Ocober 30, 1964, granting the plaintiff the right to immediate possession of the property sought to be condemned. The Court is of the opinion and holds that interest on the Judgment rendered herein should be computed from October 30, 1964, the date of the Order above referred to.

■ Concerning the value of the rights sought to be condemned, the defendant produced three witnesses. The first witness was Mr. L. C. Mueller, a long-time banker in the City of Cleveland, Oklahoma, and familiar with real estate values in the area surrounding the reserved rights in this case; Mr. Mueller also is engaged in the business of appraising real estate, and for three years or more prior to the date of his testimony taken on June 23, 1965, had been Treasurer of the City of Cleveland. Mr. Mueller testified that a bond issue of $450,000 was voted by what he described as the Cedar Creek Bay Authority; that a portion of these bonds was purchased by Sunray DX Oil Company in the amount of $316,388, and that this money was used by the Authority to construct immediately east of the property reserved in the Deeds involved herein what is known as "Port DX." He further testified that Port DX had been constructed. He testified that these were revenue bonds. How they were to be paid is not shown by the evidence. It is only reasonable to assume, however, that Sunray DX would pay some form of rental or royalty to retire the bonds which it owned. The witness testified that he felt that over a ten-year period, with the proper kind of construction of necessary facilities, the reserved rights of the defendants would produce a profit of $225,000. This witness went on to say that he did not know or have an opinion of what the rights reserved by the defendants would sell for on the open market, but based his opinion solely on what he thought the profit would be over a ten-year period.

The next witness called by the defendant was Mr. Al Schmidt. Mr. Schmidt testified that he was President of and operated Port Ketchum on Grand Lake in Oklahoma. That he had 82 docks, most of them enclosed, and he also had a heated fishing dock, and a complete marina and dry dock for overhauling motors, repainting boats, and service station facilities. The witness further testified that he had examined the area involved in this case and he gave his opinion of the value as between $250,000 and $300,000. On questioning by the Court, the witness said that the rights reserved and involved in this case, without any improvements, would be worth $200,000.

The defendant then called as a witness Mr. Charles G. Page, who stated that he lived in Gravois Mills, Missouri, and that he was the owner of Page Boat Yard on Lake of the Ozarks and had operated there for a period of twelve years; that Lake of the Ozarks is the largest manmade lake in the world. The witness testified that he examined the property involved in this case; that he knew what was necessary to develop the same, and that the property involved could be developed and would be quite profitable, and stated it was his opinion that the value of the rights reserved by the defendants, without any improvements, had a value of between $150,000 to $200,000. However, later, and at Page 54 of the Reporter's Transcript, he testified, in answer to a question by the Court, the naked rights had a value of $125,000. This witness testified that his rights on Lake of the Ozarks were similar to the rights reserved by defendants in this case and that he paid for these rights about twelve years prior to the date he testified the sum of $37,000.

The plaintiff called as a witness Mr. Norman Cobble, a real estate appraiser for the Army Corps of Engineers, who testified that he was familiar with the reserved rights in question and that in his opinion these rights had no value. He testified that he was an appraiser of real estate and not of fishing dock rights, and that his value was based upon the rights reserved without the construction of the Keystone Dam and Reservoir, and without the presence of the lake and the reservoir the rights were of no value.

The Court has before it values ranging from $300,000 down to zero, none of which values are based upon the free willing buyer-willing seller theory. The rights involved in this action are such that they do not normally, locally or reasonably come within the market value principle of willing buyer-willing seller. Notwithstanding these problems, the defendants here by contract had a reserved valuable vested interest in the commercial fishing and boat dock privileges, and perhaps no better proof than has been offered would be available to the litigants. But considering the sale on the Ozark Lake of $37,000 twelve years ago, and the close proximity of the rights which are the subject of this litigation to the town of Cleveland, Oklahoma, and also the close proximity to the metropolitan city of Tulsa, Oklahoma, and the populated area in the greater Tulsa area, and the fact that the Keystone Dam on October 30, 1964, was substantially if not completed, and was full of water, or soon would be full of water, and that the reservation was made in contemplation of all these known facts, it is the considered finding, conclusion and judgment of the Court that the defendants have been damaged by the taking of their perpetual reserved rights as set forth in the Deeds in the amount of $60,000, and the Court is of the opinion and finds that the defendants are entitled to a Judgment against the plaintiff, United States of America, in the sum of $60,000.

Judgment will be entered accordingly.